**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **Robert Earl Council,** <br><br> *Plaintiff* <br><br> **v.** <br><br> **Commissioner John Hamm, in his official capacity, for the Alabama Department of Corrections, et al.** <br><br> *Defendants.* | **Civil Action No. 2:23-cv-00658-ECM-CWB** |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**
**IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Table of Contents** _____ **i**

**Introduction** _____ **1**

**Discussion** _____ **3**

**A.  Plaintiff Council Is Likely To Succeed On The Merits Of Counts I (First Amendment Retaliation) and II (Eighth Amendment Fail to Protect).** _____ **3**

1.  Defendants Have Retaliated Against Plaintiff Council in Violation of the First Amendment. _____ 4

   a.  Plaintiff Council Has Engaged in Constitutionally Protected Activity By Being a Prison Organizer, Acting as a Jailhouse Lawyer, and Filing This Lawsuit. _____ 5

   b.  Defendants' Severe Retaliation of Plaintiff Council Would Chill a Person of "Ordinary Firmness." _____ 8

   c.  Defendants Subjected Plaintiff Council to Retaliation Because of His Protected Activities. _____ 22

   d.  The *O'Bryant* Presumption Does Not Apply Here. _____ 27

2.  Defendants Have Failed to Protect Plaintiff Council in Violation of the Eighth Amendment. _____ 29

   a.  Plaintiff Council Is at Substantial Risk of Assault or Murder. _____ 30

   b.  Defendants Are Deliberately Indifferent. _____ 32

**B.  Plaintiff Council Has Demonstrated Irreparable Harm.** _____ **37**

1.  Plaintiff Council's Ongoing Retaliatory Placement in Solitary Confinement Is an Ongoing and Irreparable Constitutional Violation. _____ 37

2.  Plaintiff Council Faces a Substantial Likelihood of Assault or Murder. _____ 38

**C.  The Third and Fourth Preliminary Injunction Factors Also Weigh in Plaintiff Council's Favor.** _____ **40**

**D.  Defendants' Evidentiary Objections Are Meritless.** _____ **41**

**E.   The Proposed Injunction Meets the PLRA Requirements.** _____ **43**

**Conclusion** _____ **43**

# INTRODUCTION

Plaintiff Council seeks preliminary relief because he is in danger, today. Defendants' retaliation against Plaintiff Council over the last six or so months in particular makes clear the substantial threat of irreparable harm in form of continued subjection to unconstitutional solitary confinement and an ongoing risk of assault and murder. But to fully appreciate the magnitude of risk Plaintiff Council faces—and why he will remain in harm's way so long as he stays at Limestone—these events must be considered in their historical context.

Since 2014, when Plaintiff Council started the Free Alabama Movement (FAM), which has been defined by peaceful speech and resistance to unconstitutional confinement, conditions and forced labor, the Alabama Department of Corrections (ADOC) has responded with every sort of punishment and cruelty, including one near-successful attempt to kill him. Limestone Correctional Facility (Limestone) is uniquely unsafe for Plaintiff Council because officials have engaged in tit-for-tat retaliation for Plaintiff Council's sustained efforts to shed light on corruption at the facility. The source of their animosity is well-documented. Among other actions, in 2019 Plaintiff Council went public about a corrupt gambling ring run by correctional officers, including Lt. Jeremy Pelzer. That same year, Plaintiff Council helped a prisoner sue Lt. Pelzer after Lt. Pelzer pepper sprayed the prisoner and slammed him to the ground. Doc. 3-5, Declaration of Travis Griggs ¶¶ 7–8.

Plaintiff Council was temporarily transferred away from Limestone in 2020, after which he filed lawsuits against Limestone administration and officers for retaliating against him while he was still at Limestone. In 2021, ADOC responded to his lawsuit and continued organizing by transferring him back to Limestone, throwing him "into a snake pit" and putting him "in a position of danger." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). Immediately upon Plaintiff Council's return, Limestone officials began retaliating against him. Ex. 1, Third Declaration of

Plaintiff Council ¶¶ 4–5. They placed him in solitary confinement without justification, disciplinary or otherwise. *Id.* ¶¶ 4–6.

This mistreatment has not abated. Rather, the threat to Plaintiff Council's life has escalated. In response to Plaintiff Council's role in exposing corruption at Limestone, Lt. Pelzer has methodically planted the seeds and cultivated the conditions for preventable but life-threatening harm to Plaintiff Council. He told a number of gang members this past spring that if any prisoner killed Plaintiff Council, he would give them a "pass." Council 3rd Decl. ¶ 36. Then, Lt. Pelzer manufactured an incentive for prisoners to harm Plaintiff Council: he identified Plaintiff Council as the reason "the entire building . . . was being denied commissary," an act that "is often used as a form of punishment." *Id.* ¶¶ 20–22. Limestone officials have tacitly condoned Lt. Pelzer's actions and engaged in their own overt retaliation. Most recently, they levied pretextual disciplinary charges against Plaintiff Council and placed him in solitary confinement because of his organizing. Lt. Pelzer, along with the named Defendants, have placed Plaintiff Council in "fear for [his] life," Council 3rd Decl. ¶ 44.

Plaintiff Council's fear is particularly credible considering that ADOC is one of the "deadliest places on earth," Beth Shelburne, *Alabama Prisons Among Deadliest Places on Earth*, ACLU SMART JUSTICE ALABAMA (Feb. 18, 2020), https://bit.ly/3RiAjuc. Indeed, ADOC has been hauled into court for a systemic use of excessive force by correctional officers and a failure to protect from prisoner-on-prisoner violence. *See* Second Amended Complaint at ¶¶ 37–44, 194–204, *United States of America v. Alabama, Alabama Dep't of Corr.*, No. 2:20-cv-01971-RDP (N.D. Ala. Nov. 19, 2021), Doc. 71.

This supplemental brief demonstrates why preliminary relief is necessary. In short, there is an obvious and serious risk to Plaintiff Council's safety at Limestone. The facts summarized above

and detailed below show Defendants have retaliated against Plaintiff Council and failed to protect him from a serious risk of assault or murder (Counts I and II).[1] He is suffering ongoing, irreparable harm because of his retaliatory subjection to solitary confinement, and there is a substantial risk that Lt. Pelzer's actions will lead to Plaintiff Council's assault or murder. The equitable balancing and public interest factors, which merge in a case involving constitutional violations, also weigh in Plaintiff Council's favor because Defendants are violating his constitutional rights.

This Court must intervene by ordering Plaintiff Council's transfer out of solitary confinement and away from Limestone.

## DISCUSSION

Preliminary relief is justified if 1) there is a substantial likelihood of success on the merits of the plaintiff's claim; 2) there is a substantial likelihood the plaintiff will suffer irreparable harm; 3) the threatened injury outweighs any potential harm to the defendant; and 4) considerations of the public interest favor an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176, 1176 n.9 (11th Cir. 2000). As explained in full below, each of these factors weighs in Plaintiff Council's favor.

### A.   Plaintiff Council Is Likely To Succeed On The Merits Of Counts I (First Amendment Retaliation) and II (Eighth Amendment Fail to Protect).

The record evidence demonstrates Plaintiff Council's likelihood of succeeding on Counts I and II. With respect to Count I, Plaintiff Council has engaged in a range of protected activities— from lodging grievances and going public about the constitutional violations that run rampant at Limestone to assisting other prisoners with doing the same to passively resisting an unlawful order that threatened his life. And for each of these actions, there has been a reaction. Defendants have sanctioned false disciplinary charges and put him in solitary confinement, intentionally blocked

---

[1] Plaintiff Council does not seek preliminary relief on the remaining counts right now. *See* Ex. 2, November 30, 2023 Preliminary Injunction Hearing Transcript (Hrg. Tr.) 8:16–22.

3

his transfer away from Limestone, and threatened his life. And they have repeatedly done so in a way that evinces their retaliatory animus.

As for Count II, Lt. Pelzer, with Warden Streeter's approval, has put a giant target on Plaintiff Council's back: He has promised gang members protection if they killed or assaulted Plaintiff Council—following the same method of retribution Lt. Pelzer has used before. And he has sowed discord to motivate the gang members to assault Plaintiff Council: Lt. Pelzer has, on more than one occasion, used baseless accusations against Plaintiff Council to justify individual and collective punishment of other prisoners—telling them that Plaintiff Council was to blame. Though Plaintiff Council has rang the alarm bells at every opportunity and in every way that he could, Defendants have refused to protect him.

### 1. Defendants Have Retaliated Against Plaintiff Council in Violation of the First Amendment.

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003). An incarcerated plaintiff establishes a First Amendment retaliation claim when "(1) his speech was constitutionally protected; (2) he suffered . . . retaliatory conduct [that] would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Williams v. Corr. Officer Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023) (citation omitted). "[T]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech.'" *Farrow*, 320 F.3d at 1248 (citation omitted). The prisoner "need not allege a violation of a separate and distinct constitutional right." *Id.* "For example, a prisoner can state a claim of retaliatory transfer even though he does not have a constitutional right not to be transferred." *Bennett v. Hendrix*, 423 F.3d 1247, 1253 n.6 (11th Cir. 2005). Because this claim involves a complex web of protected activities, retaliatory acts, and

4

evidence of animus, Plaintiff Council has prepared a demonstrative exhibit summarizing the evidence. *See* Ex. 18.

### a. Plaintiff Council Has Engaged in Constitutionally Protected Activity By Being a Prison Organizer, Acting as a Jailhouse Lawyer, and Filing This Lawsuit.

A prisoner's First Amendment speech is protected so long as it is not "inconsistent with . . . [his] status as a prisoner or with the legitimate penological objectives of the corrections system." *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Over the years (and in recent months), Plaintiff Council has engaged in a range of speech that satisfies this standard. He filed this lawsuit and lodged complaints about officers at Limestone; assisted other prisoners with filing lawsuits and otherwise asserting their constitutional rights in the summer of 2023; questioned Sgt. Parker's actions and passively resisted his command on October 15, 2023; and spoke to the media about the corruption at Limestone. Though Plaintiff Council parses out specific protected activities below, they are all part of his years-long campaign to expose corruption and challenge constitutional violations within ADOC and relate to his work with the non-violent Free Alabama Movement, which he co-founded in 2014.[2]

*Filing Lawsuit and Lodging Grievances.* Filing grievances or lawsuits against prison officials about mistreatment or denial of constitutional rights is the core of constitutionally protected speech. *See e.g.*, *Farrow*, 320 F.3d at 1248. This applies to written and oral grievances alike. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018) (collecting cases). Plaintiff Council exercised this right in myriad ways: Plaintiff Council's lawyers sent letters to ADOC officials about the violation of Plaintiff Council's rights at Limestone, including two letters in 2023. Docs.

---

[2] *See generally F.A.M. Pamphlet: Who we Are*, FREE ALABAMA MOVEMENT, https://bit.ly/46XdRwB (last viewed Dec. 13, 2023) ("FREE ALABAMA MOVEMENT is a grassroots organization founded by men incarcerated in Alabama that supports the Non-Violent and Peaceful Protests for Civil and Human Rights.").

3-3, 3-6. Plaintiff Council reported Lt. Pelzer to Agent Pollard in September 2023 after his lawyer called LESD. Council 3rd Decl. ¶ 41; Hrg. Tr. 78:10–80:1; 81:18–82:4. And, most recently, he filed this lawsuit.

*Assisting Prisoners with Protected Activity.* Connecting prisoners with legal representation is itself a protected activity. *Adams v. James*, 784 F.2d 1077, 1082 (11th Cir. 1986). And "the First Amendment insulates from retaliation a prisoner who engages in a protected activity on behalf of other [prisoners]." *Taylor v. Nix*, 240 F. App'x 830, 836 (11th Cir. 2007) (citing *Adams*, 784 F.2d at 1081).

Between July and September 2023, Plaintiff Council assisted at least five other prisoners with their own protected activity—seeking legal redress after being assaulted by Limestone officers—by referring them to civil rights attorneys. *See* Doc. 1-1, Council 1st Decl. ¶¶ 17–22; Hrg. Tr. 47:25–48:10. This includes Yinessa Banks, whom Lt. Pelzer attacked. Ex. 3, Declaration of Yinessa Banks ¶ 3–4; Hrg. Tr. 47:25–48:10. Warden Streeter, Lt. Pelzer, and other Limestone officers "became alarmed by the increasing number of attorney legal visits and legal phone calls being scheduled with those five prisoners," and "began to fear that [Plaintiff Council] was orchestrating a legal campaign to hold them accountable." Council 1st Decl. ¶ 21.

*Questioning Authority and Passively Resisting an Unreasonable Threat of Force.* Plaintiff Council also engaged in protected activity by questioning correctional officers' illegal attempt to throw him to solitary confinement instead of simply acquiescing. On October 15, 2023, Sgt. Parker, Officer Brewer, and other officers accosted him at his cell. Hrg. Tr. 49:24–51:2; 52:24–53:2. Sgt. Parker told Plaintiff Council to "turn around" because they were taking him to solitary confinement. *Id.* 50:14:22. Plaintiff Council hesitated when the officers approached, asked "[F]or what?," and told them that he had done nothing wrong. *Id.* Plaintiff Council did not physically

resist or assault the officers. *Id.* 52:20–23; *see also* Doc. 32-3 (accusing Plaintiff Council of "refus[ing] all orders to be handcuffed" with no mention of physical resistance). Plaintiff did not comply with the order to turn around and submit to handcuffs because he feared for his life: the last time an officer ordered Plaintiff Council to turn around, the officer attacked him and he "lost [an] eye and had [his] head busted in three places." Hrg. Tr. 205:24–25; *see also id.* 54:20–55:5 ("I almost lost my life like that once before.").

Plaintiff Council was justified in asking a question because he feared that the officers were about to violate his rights. "The freedom of individuals to verbally oppose or challenge police action" without risking retaliation "is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). Indeed, "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at [correctional] officers," and "courts need to be alert" to an officers' actions "that are prompted by constitutionally protected speech, even when the [individual's] words are directed at [] officers performing official tasks." *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citations omitted); *see also Rivera v. McNeal*, No. CV 1:19-1037-KD-N, 2021 WL 1151558, at *6 (S.D. Ala. Feb. 24, 2021) (explaining that an officer is not automatically justified in using pepper spray if a prisoner questions an order).

Similarly, Plaintiff Council was justified in passively resisting instead of turning around to be handcuffed. Peaceful opposition to a threat of physical force or other unconstitutional conduct by an officer is protected activity. *See generally Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276–78 (2009) (in a Title VII retaliation case, holding that expressive, oppositional conduct, including passive resistance "not by instigating action, but by standing pat" in the face of an unlawful order is protected conduct). Sgt. Parker came to Plaintiff Council's cell

and demanded, without explanation, that Plaintiff Council turn around and submit to handcuffs so he could be taken to solitary confinement. Plaintiff Council construed this demand as a threat of force, due to the unexplained circumstances and his previous experience. Hrg. Tr. 54:20–55:5; *id.* 205:24–25. Plaintiff Council's hesitation to turn his back to the officers was also justifiable in light of Plaintiff Council's previous interactions with Officer Brewer. Between October and December 2022, Officer Brewer "shook down" Plaintiff Council's cell numerous times. Doc. 1-2, Council 2nd Decl. ¶¶ 48–55; Council 3rd Decl. ¶ 18. On December 2, 2022, Officer Brewer came into Plaintiff Council's cell at 3:00 a.m. and pepper sprayed Plaintiff Council in the face, completely unprovoked. Council 2nd Decl. ¶ 56; Council 3rd Decl. ¶¶ 18-19.

*Speaking to the Media*. Plaintiff Council has also spoken to the media about mistreatment by prison officials without violating applicable prison regulations. That speech was protected because it was "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822. Specifically, Plaintiff Council spoke with Keri Blakinger of the Marshall Project on a legitimately placed prison phone call, which ADOC conceded was not a violation of any ADOC rule. Council 1st Decl. ¶ 67; Hrg. Tr. 36:17–25; 69:13–14; Ex. 4, Blakinger-ADOC Email Exchange. And as early 2019, Plaintiff Council alerted the media that Lt. Pelzer and other correctional officers ran a gambling ring at Limestone. Council 1st Decl. ¶ 5; Hrg. Tr. 34:9–17; 189:1–18. Plaintiff Council's history of reporting issues at Limestone to the media establishes why Limestone officials, including Warden Streeter and Lt. Pelzer, have a target on Plaintiff Council's back today.

### b. Defendants' Severe Retaliation of Plaintiff Council Would Chill a Person of "Ordinary Firmness."

The retaliation Plaintiff Council has experienced is more than sufficient to chill a person of "ordinary firmness." *Bennett*, 423 F.3d at 1253–54. This analysis employs an "objective

standard"; what matters is whether a hypothetical person of "ordinary firmness" in the plaintiff's shoes would be chilled, regardless of whether the defendants employed "a direct prohibition against the exercise of First Amendment rights." *Id.*

Because it is an "objective standard," the focus is not "on the plaintiff's subjective, actual chilling," and it is irrelevant that Plaintiff Council has not been actually deterred from filing the present lawsuit or continuing his prison organizing. *See id.* at 1254. Stated simply, "an actual chill is not necessary to state a First Amendment violation." *Id.* (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)); *see also Osterback v. Kemp*, 300 F. Supp. 2d 1238, 1256 (N.D. Fla. 2003) ("That Plaintiff may be less deterred than others is irrelevant.").

A "First Amendment retaliation claim [by a prisoner] can use any sort of adverse action as its second element," *Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023), including a pattern of "harassment," *Bennett*, 423 F.3d at 1254; *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Defendants have subjected Plaintiff Council to a number of adverse actions that are deemed retaliatory under governing law, including two that highlight why preliminary relief is necessary: Defendants have refused to transfer Plaintiff Council away from Limestone and have placed him in solitary confinement, causing irreparable harm, *see infra* at 37–38. Defendants have also attempted to suppress Plaintiff Council's testimony at the preliminary injunction hearing in his own lawsuit, used force against him, threatened him, fabricated disciplinary charges against him, and engaged in third-party retaliation.

*Retaliatory Refusal to Transfer.* In recent months, Limestone officials have undertaken efforts to move Plaintiff Council to a different facility, but high-ranking ADOC officials have prevented the transfer. In September 2023, Warden Crabtree instructed Classification Supervisor Kristen Obenchain to look into transferring Plaintiff Council away from Limestone in exchange

for his validated "enemy," Melvin Ray, at St. Clair Correctional Facility ("St. Clair"). Hrg. Tr. 102:2–12; 133:11–18,[3] The Limestone executive team was responsible for this request, *id.* 99:10–17; 132:10–13, though Ms. Obenchain did not know what prompted the inquiry, *id.* 95:22-24. But timing wise, it appears that Warden Crabtree made this request around the same time that Plaintiff Council's attorney contacted LESD and Agent Pollard interviewed Plaintiff Council about threats Lt. Pelzer had made (both in September, *id.* 78:14–18; 95:13–19), indicating that Defendants knew they needed to transfer Plaintiff Council for his own safety.

Officials in Montgomery seemingly blocked the transfer. On October 18, 2023, Cpt. Denise McKenzie came by Plaintiff Council's cell to take a statement for a use-of-force report. *Id.* 55:16–19. They discussed a prison transfer, and Cpt. McKenzie "agreed and told [Plaintiff Council] that they had been trying repeatedly to get him transferred and she didn't know what the problem was." *Id.* 56:7–12. She also told Plaintiff Council "she was going up front to see what the holdup was, as they were trying to get [him] transferred," implying that officials above the facility level were responsible for the fact that he was still at Limestone. *Id.* 55:20–56:12. Indeed, ADOC's transfer division asked Ms. Obenchain if LESD had been notified of the transfer request, invoking the pretextual "enemy" designation as a barrier to transfer. *Id.* 96:4–97:3; 102:6–15.

After Plaintiff Council's attorney sent a demand letter on November 6, 2023, the retaliation became overt. According to Lt. Howell, Limestone stopped whatever transfer arrangements they

---

[3] This justification is itself pretextual. As Mr. Ray attests, he and Plaintiff Council have known each other for more than twenty years and worked together to found FAM and draw attention to ongoing human rights abuses. Ex. 5, Declaration of Melvin Ray ¶¶ 3–4. He has "never been" Plaintiff Council's enemy and never requested that they be validated as enemies. *Id.* ¶ 5. Importantly, Warden Streeter knows that Mr. Ray and Plaintiff Council co-founded FAM yet he relied on the enemy validation and did not question it. Hrg. Tr. 133:11–134:23. But ADOC officials have been on notice that Mr. Ray and Plaintiff Council are not enemies, and that any such enemy validation is false, since 2019. Doc. 3-6 at 6–7, Gespass November 8, 2019 Letter.

had been working on because Plaintiff Council's "attorneys demanded that [he] be transferred by seven o'clock" and "it would have set bad precedent if [Plaintiff Council] dictated to them that [he] should be transferred." Hrg. Tr. 56:15–57:8 (Lt. Howell explained that there was a legitimate basis for the transfer, including Plaintiff Council's medical needs); Doc. 3-3 at 5 (demand letter setting 7 PM deadline for transfer on November 8). This "demand" that Plaintiff Council made was, of course, protected activity.[4]

The refusal to transfer Plaintiff Council to a different prison facility under these circumstances constitutes retaliation. *See Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013) (reversing grant of defendant's summary judgment motion on retaliatory transfer claim); *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989) (finding that prisoner stated a claim by alleging that he was transferred to a different prison because of his protected activity); *Brazill v. Jones*, No. 5:21-cv-99-TKW-MJF, 2023 WL 2872449, at *21–22 (N.D. Fla. Feb. 3, 2023) ("a prison transfer … may violate the prisoner's constitutional rights if done in retaliation.").

This is especially true when the denial is accompanied by worse conditions of confinement. *See id.* at *9. Limestone is uniquely unsafe for Plaintiff Council because he is a target of the administration, correctional officials, and—because of actions by those individuals—other prisoners. Lt. Pelzer in particular has made Plaintiff Council susceptible to attack by fellow prisoners. On around June 28, 2023, he publicly (and without meaningful evidence) accused Plaintiff Council of posting a video online. Council 3rd Decl. ¶ 20. Because of this, he specifically identified Plaintiff Council as the reason "the entire prison population was being denied

---

[4] Captain McKenzie and Lt. Howell's statements are admissible as admissions by a party opponent under Federal Rule of Evidence 801(d)(2)(A). *See infra* at 42–43.

commissary," an act that "is often used as a form of punishment," which "placed a target on" Plaintiff Council's back. *Id.*

And sometime between May 24, 2023 and June 14, 2023, Lt. Pelzer made a statement to another prisoner that "Robert Earl is the reason Lewis (head of the Crips) can't get out [of solitary confinement]," and "[e]ven if y'all killed him I'll make sure nothing happens to y'all." Council 1st Decl. ¶ 37; *see also* Hrg. Tr. 30:23–31:7; ("[I]f something happened to him, y'all do something to him or even kill him, I'll make sure that don't nobody get in trouble for it."); Council 3rd Decl. ¶ 34 (Lt. Pelzer said that if any prisoner killed Plaintiff Council, he would give them a "pass" because he wanted Plaintiff Council dead). Other Limestone officers have also indicated their willingness to kill prisoners generally and Plaintiff Council specifically. Council 3rd Decl. ¶¶ 26– 34. On June 23, 2023, when Plaintiff Council asked Lt. Gilbert to stop another officer from beating a man on the ground, rather than intervene Lt. Gilbert told Plaintiff Council, "Fuck that shit, I'm going to start sending their ass out the back gate," referring to killing prisoners. *Id.* ¶ 28.

Each of these statements alone is threatening. But the dangerousness is heightened when one considers the context. ADOC is one of the "deadliest places on earth." Shelburne, *supra* at 2. In this desperate and violent environment, prisoners are killed over $10.00 debts.[5] Lt. Pelzer's statement that Plaintiff Council was the reason other prisoners could not "catch store" is particularly dangerous because it "placed a target on" Plaintiff Council. Council 3rd Decl. ¶¶ 20– 22. "This type of collective punishment has never been done before" and was "an attempt by Lt. Pelzer to manipulate other people's anger and to incentivize them to act on their anger, target [Plaintiff Council], and kill or injure [him]." *Id.*. Similarly, Lt. Pelzer's comments that other

---

[5] *Georgia man says nephew murdered by inmates over $10 drug debt in Alabama prison*, Cynthia Gould, ABC 33/40, https://bit.ly/41lxgpU (last accessed December 9, 2023).

prisoners would be protected if they killed Plaintiff Council placed him "in fear for [his] life." *Id.* ¶ 36. And there are a number of officers, including Lt. Gilbert, whom Plaintiff Council needs to be aware of and "make sure are not behind [him] or around [him] when a riot or assault breaks out [at] the prison" because of their threats or actions toward Plaintiff Council. *Id.* ¶ 30.

*Retaliatory Solitary Confinement.* Placement in solitary confinement "constitutes an adverse action for purpose of a First Amendment retaliation claim." *Williams*, 64 F.4th at 1193; *see also O'Bryant v. Finch*, 637 F.3d 1207, 1216 (11th Cir. 2011) (assuming "O'Bryant has suffered adverse action (here 30 days' disciplinary confinement)"); *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) ("In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse."); *cf. Hicks v. Ferrero*, 241 F. App'x 595, 598 (11th Cir. 2007) (finding a clearly established violation when the plaintiff alleged that defendants retaliated against him for filing grievances by raising his security level).

Warden Streeter placed Plaintiff Council in solitary confinement on October 15, 2023, as a form of retaliation. *See* Doc. 32-3; Hrg. Tr. 50:9–22. That day, Warden Streeter instructed Sgt. Parker to go to Plaintiff Council's cell after receiving an email from LESD containing a Facebook link to a video of Plaintiff Council. Hrg. Tr. 117:5–14; 119:20; 121:22: –122:2. Sgt. Parker, Officer Brewer, and other correctional officers accosted Plaintiff Council in I dorm and demanded that he submit to handcuffs so they could take him to solitary confinement. *Id.* 50:9–22; Doc. 32-3. The video showed Plaintiff Council and two other prisoners "calling for a stop to violence between the gang members and to come together." Hrg. Tr. 53:3-8; *see also* Ex. 6, 2020 Video from Donaldson Correctional Facility. They explicitly referenced their affiliation with FAM. 2020 Video from Donaldson.

13

Warden Streeter testified that knew from looking at the video that it was not filmed at Limestone but that the video was uploaded recently to a Facebook profile. Hrg. Tr. 119:8–15. As a result, he assumed Plaintiff Council had a contraband cell phone with which he uploaded the video—even absent indication that Plaintiff Council is the one who did so. *Id*. 119:16–120:11.[6]

According to Sgt. Parker, Warden Streeter specifically "instructed [Sgt. Parker] to place Robert Council B/181418 in Restrictive Housing for Rule Violation #529-unauthorized participation in social networking." Doc. 32-3 (Sgt. Parker's narrative in disciplinary report). Although when testifying, Warden Streeter denied Sgt. Parker's firsthand account and instead insisted that he simply ordered a "shake down,"—not (a concededly unjustified) placement in solitary confinement—this Court should not credit his *ex post* self-serving testimony. *See* Hrg. Tr. 121:22-122:2. Additionally Sgt. Parker's documented account about the initial encounter is exactly what Plaintiff Council said happened. Hrg. Tr. 203:18-204:2; Doc. 32-3. In other words, Warden Streeter ordered Sgt. Parker to place Plaintiff Council in solitary confinement for something Warden Streeter knew—by his own admission—occurred three years earlier at a different prison. (Indeed, Warden Streeter later found Plaintiff Council not guilty of violating the social media policy. Doc. 32-4.) And once Sgt. Parker realized that he would not be able to sustain a disciplinary infraction for the video, he fabricated a disciplinary charge against Plaintiff Council to justify keeping him in solitary confinement. *See infra* at 17–18.[7]

---

[6] Defendants refused to give Plaintiff Council the email Warden Streeter received, which could have been used to establish what knowledge Warden Streeter had when he ordered that Plaintiff Council be taken to solitary confinement.

[7] Plaintiff Council had a reclassification hearing in early December based on the alleged October 15 assault,. The day before the hearing, the officer who served Plaintiff Council the notice told him that he knew Plaintiff Council didn't assault Sgt. Parker, and during the hearing, the classification supervisor said the same thing and explained that he was just doing his job.

This was not the first time Defendants threw Plaintiff Council in solitary confinement as retaliation for his organizing activities. In September 2022, prisoners across ADOC, including Limestone, engaged in a work strike.[8] On September 28, 2022, Plaintiff Council negotiated with prison administrators regarding whether he would call for an end to the prison work strike. Council 1st Decl. ¶ 28. An hour later, a CERT team and other officers entered Plaintiff Council's cell and to conduct a "shake down" and strip search. *Id.* ¶ 29. The correctional officers then told Plaintiff Council that he was being moved to solitary confinement. *Id.* He asked them to see a supervisor because he had not broken any rules. *Id.* ¶ 30. They responded by twisting his arm and dragging him across the floor. *Id.* ¶ 30.

ADOC officials also once ordered Plaintiff Council's placement in solitary confinement for talking to the media, even though they later admitted he had not violated any ADOC regulations, *see supra* at 8–9: "On January 31, 2022, [Plaintiff Council's mother] called Limestone to inquire why [her] son Robert Earl Council had been placed in segregation on January 28, 2022. Captain Caldwell stated that Mr. Council had one disciplinary violation because Montgomery called and said that he was talking to media and so he should be locked up." Ex. 7, Decl. of Earnestine Cole Council at 1; *see also* Council 1st Decl. ¶ 67.

*Retaliatory Use of Force.* On October 15, 2023 Sgt. Parker retaliated against Plaintiff Council for questioning and passively resisting his remand to solitary confinement by *immediately* raising a canister of SABRE Red cell buster pepper spray and spraying Plaintiff Council in the face, even though it is a "cell extraction tool" that is supposed to be sprayed into a cell, not directly

---

[8] John H. Glenn, *Incarcerated workers go on strike in Alabama's correctional facilities*, ALABAMA POLITICAL REPORTER (Sep. 26, 2022), https://bit.ly/46V6PIP.

on a prisoner.[9] Hrg. Tr. 50:19–51:5. Plaintiff Council turned his head, and the chemicals burned his face and "went into [his] left ear." *Id.* 51:12–16. The entire incident, from the initial command to turn around to the use of chemical spray, lasted "eight to ten seconds." *Id.* 206:1–5.

A use of force can "satisfy the 'adverse action' prong." *Hall*, 67 F.4th at 1294. And "a prisoner initiating a verbal altercation does not give prison guards carte blanche to use force sadistically and maliciously." *Williams*, 64 F.4th at 1197; *see also id.* at 1192–93. ("[T]he search of [a prisoner's] cell and the destruction of his possessions and materials can support a First Amendment retaliation claim.") (citing *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986)). This is true even though Plaintiff Council questioned Sgt. Parker's order, as "'[n]ot every instance of [a prisoner's] resistance justifies the use of force and use of pepper spray will not be justified every time [a prisoner] questions orders or seeks redress for an officer's actions.'" *Rivera*, 2021 WL 1151558, at *6 (quoting *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)).

Limestone officers also forcibly retaliated against Plaintiff Council for the role he played in peacefully representing Limestone prisoners during negotiations with the administration about ending the September 2022 work stoppage. *See* Council 1st Decl. ¶¶ 27–28. When Limestone officers came to Plaintiff Council's cell shortly after the negotiation, a CERT team twisted Plaintiff Council's arm behind his back, handcuffed him and dragged him by an arm and leg across the floor. *Id.* ¶ 29–30. Then on December 2, 2022, Officer Brewer came into Plaintiff Council's cell at 3:00 a.m. and pepper sprayed Plaintiff Council in the face, completely unprovoked. Council 2nd Decl. ¶ 56; Council 3rd Decl. ¶ 18; Doc. 3-6, April 10, 2023 Gespass Letter at 2.

---

[9] The SABRE Red cell buster spray is apparently lethal enough that SABRE Red restricts any details about it from public access. But an online retailer describes it as "an ideal cell extraction tool" and gives examples of its use that clearly contemplate an officer spraying it from outside a cell. Base Supply Center, *Sabre Red 1.33% MC 18.5oz Cell Buster w/Hose & Wand 920060-W*, https://bit.ly/3th6276 (last viewed Dec. 13, 2023).

*Fabricated Disciplinary Charges and Sham Disciplinary Proceedings*. Fabricated disciplinary charges and sham disciplinary proceedings used to justify Plaintiff Council's subjection to solitary confinement have also been a hallmark of Plaintiff Council's time at Limestone. These incidents constitute retaliation. *See Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) (unfounded disciplinary reports show "plausible allegations of retaliation").

The October 15, 2023 incident exemplifies the practice of fabricating disciplinary charges. After the use of force, Sgt. Parker confronted Plaintiff Council with a "still picture of a video" and told him that they had evidence he "was on social media 14 hours ago." Hrg. Tr. 51:24–52:3. Plaintiff Council explained to the officers that the video was from 2020 and filmed at another prison, not Limestone. *Id.* 52:4-13; *see also id.* 151:21-24 (Warden Streeter acknowledging the video was from Donaldson Correctional Facility). When Sgt. Parker "realized that the video was from three years ago at another institution," he told Plaintiff Council that he would charge him with assault, even though no such assault occurred. *Id.* 52:17–23.

The disciplinary report accusing Plaintiff Council of assault is facially implausible. It accuses Plaintiff Council of "deliver[ing] a strike with [his] elbow into [Sgt. Parker's] chest," after Sgt. Parker had handcuffed Plaintiff Council. Doc. 32-3. Plaintiff Council estimates that Sgt. Parker is around 6'4" in height, while Plaintiff Council is only 5'6". Hrg. Tr. 204:3–9. Given the size differential, it strains credulity to say that Plaintiff Council elbowed Sgt. Parker in the chest while in handcuffs.[10]

Despite this, Plaintiff Council was found guilty of assaulting Sgt. Parker—a finding Warden Streeter sustained. *See* Doc. 32-3. On October 30, 2023, Plaintiff Council was called to a disciplinary hearing on four charges stemming from the October 15 incident: 1) assault on an

---

[10] Defendants refused Plaintiff Council's request for security camera video footage of this incident.

17

officer, 2) unauthorized participation in social networking, 3) failure to obey a direct order, and 4) violation of state and federal law. Docs. 32-3–32-6. When Plaintiff Council arrived at the hearing, he saw that the disciplinary violation forms on the table in front of the hearing officer were already filled out. Hrg. Tr. 54:2–10. But the arresting officer is supposed to provide testimony at the hearing, not beforehand. *See, e.g.*, Doc. 32-3 (front page of disciplinary report has a section titled: "13. Arresting Official's testimony (at the hearing)"). In addition, Sgt. Parker (the arresting officer) was not at the hearing, nor were any other witnesses. Hrg. Tr. 53:21–54:2; 71:20–24.

This was not the first time Limestone staff subjected Plaintiff Council to a sham disciplinary process based on fabricated charges to quell his organizing: "During the September 2022 work strike" at Limestone, for instance, Lt. Pelzer "wrote false disciplinar[y]" charges against Plaintiff Council even thought he was not "involved or present for any of the incidents." Council 3rd Decl. ¶ 7. Lt. Pelzer was retaliating against Plaintiff Council because Lt. Pelzer's efforts to convince gang members "to ask their members not to support the work strike in protest of the prison conditions" failed. *Id.* ¶ 33. After meeting with the gang members and Plaintiff Council together, Lt. Pelzer was angered that the gang members "sided with the work strike," which he blamed on Plaintiff Council. *Id.* Warden Streeter, who had "personally observed the September 28, 2022 incident in B dorm and knew that [Plaintiff Council] did not assault an officer or incite prisoners to riot," "affirmed the baseless disciplinar[y] charges" anyway. *Id.* ¶¶ 8–15. At a subsequent reclassification hearing based on these false disciplinary charges, two classification specialists told Plaintiff Council that they knew the charges "were a lie." *Id.* ¶ 16.

*Retaliatory Attempt to Silence Plaintiff Council.* Defendants also retaliated against Plaintiff Council by attempting to suppress his testimony at the preliminary injunction hearing. On November 29, 2023, the *day before* the hearing, an Officer Carter and Nurse Turner approached

Plaintiff Council. Hrg. Tr. 59:14–23. They told Plaintiff Council that he had a conflict on an unspecified day between a medical appointment and a legal visit and asked him if he would consent to reschedule the legal visit. *Id*. 59:25–60:9. Plaintiff Council agreed to reschedule the legal visit so long as it was not the next day (Thursday) or the day after (Friday) because he had a court hearing he could not miss. *Id*. This caveat was not included on the medical refusal form they had Plaintiff Council sign:



Ex. 8, November 29, 2023 Refusal of Medical Services Form.

Defendants, through their attorney Tara Hetzel, then informed Plaintiff Council's attorneys that he did not wish to attend the hearing—a blatant misrepresentation of his wishes. Ex. 9, Nov. 29 Email Exchange at 3–5. She relied on the medical refusal form Plaintiff Council had signed as supposed proof—though it made no mention of the preliminary injunction hearing. *Id*. at 5. Plaintiff's attorneys called Ms. Hetzel for clarification, and she said that Plaintiff Council had agreed to not appear at the hearing on November 30, 2023. When Plaintiff Council's attorneys said

that this was not what Plaintiff Council wanted (which they were able to confirm because they fortuitously happened to be on a legal call with him at the same time), Ms. Hetzel insisted that she had a form signed by Plaintiff Council demonstrating that he wanted to skip the hearing. Yet the form did not actually say that. *See* Medical Refusal Form. Eventually, after undersigned counsel firmly reiterated Plaintiff Council's wishes to attend the hearing and reschedule the medical appointment, Ms. Hetzel relented. *See id.* at 7. The timing and degree of misrepresentation of Plaintiff Council's statements suggest that this episode was either an odds-defying coincidence or an attempt to thwart Plaintiff Council's protected speech at the preliminary injunction hearing.

  *Witness and Friend Retaliation*. Retaliation against a witness or friend of the plaintiff also constitutes unlawful retaliation, because it would "dissuade[]" a person of ordinary firmness "from engaging in protected activity." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011).

  Lt. Pelzer has also retaliated against another prisoner, Anthony Jackson, for his protected activity of participating as a witness in this case. On Thursday, November 23, 2023, "[Jackson] was taken to the shift office because [he] had been requesting a bed or place[] to sleep." Ex. 14, Declaration of Anthony Jackson ¶ 30. "Lt. Pelzer was in the shift office when [Jackson] got there, and he addressed [Mr. Jackson's] request for bedding," saying "why am I going to help you, when I see your name in this lawsuit, pointing to a copy of the complaint on his desk." *Id.* ¶¶ 31–32. Because of Lt. Pelzer's retaliation, Jackson has been effectively stranded in prison, "sleep[ing] on the floor" "with no mat to sleep on," *Id.* ¶ 21, and without any "bedding" or "place[] to sleep," *Id.* ¶¶ 30–31.[11]

---

[11] Based on recent communications with Mr. Jackson, Plaintiff's counsel believe that he is still without bedding, a blanket, or shoes, and that he recently was hospitalized with pneumonia.

Lt. Pelzer also credibly threatened Plaintiff Council's friend (and her kids) when she helped Plaintiff Council expose Lt. Pelzer's gambling ring in 2019. Ex. 10, Declaration of Elizabeth Davenport ¶¶ 5–16. Lt. Pelzer told a prisoner that he knew Plaintiff Council was "working on something to get [Lt. Pelzer] fucked up" and that he "will regret it." Ex. 11, Declaration of Darius Mabry at 1. Lt. Pelzer also said "he would somehow involve Robert Council's girlfriend because he knew where she lived and knew she had kids." *Id.* "After learning about this," Ms. Davenport "was scared for [her] personal safety and the safety of [her] family. [She] took the threat seriously because [she] know[s] Lt. Pelzer personally, because he knows where [she] lives, and because he has a reputation for carrying a gun at all times." Davenport Decl. ¶ 14.

*Retaliatory Threats*. Plaintiff Council has also experienced retaliation in the form of threats and intimidation from Lt. Pelzer. *See supra* at 12–13; *Douglas*, 535 F.3d at 1321 (concluding that threats, intimidation, and other harassment showed "plausible allegations of retaliation").

The week after Plaintiff Council filed this lawsuit, several officers "warned [him] not to take food from runners and to be careful about what [he] eat[s] because Lt. Pelzer may seek to poison [him]." Council 3rd Decl. ¶ 43. And earlier this year, Lt. Pelzer promised gang members protection if they killed Plaintiff Council, while other officers made veiled threats to Plaintiff Council directly. *See supra* at 12–13. Plaintiff Council took these threats very seriously, in part because he knew that Lt. Pelzer had covered up the violence of other gang member prisoners. Hrg. Tr. 31:13–16; Council 3rd Decl. ¶ 37 (explaining that in September another prisoner "was stabbed multiple times and robbed by prisoners working as runners for Lt. Pelzer"); Ex. 13, Declaration of A.A. (describing the stabbing incident and Lt. Pelzer's role in covering it up).[12] And as described more fully above, Lt. Pelzer also told at least two gang members that Plaintiff Council was the

---

[12] Plaintiff Council is moving to file this declaration under seal.

21

reason all prisoners were being deprived commissary. *See supra* at 12–13. This accusation is dangerous in a prison environment like Limestone's, where individuals have access to limited resources, tensions run high, and violence is common. *Id.*

These comments by correctional officers threatening to kill or harm Plaintiff Council lack any legitimate justification. They constitute retaliation. *See generally Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147–48 (2000). As the *Reeves* court noted, "once the [defendant's] justification has been eliminated, discrimination [or unlawful motive] may well be the most likely alternative explanation." *Id.*

### c. Defendants Subjected Plaintiff Council to Retaliation Because of His Protected Activities.

Plaintiff Council has shown that Defendants' pattern of retaliation against him has recently escalated and culminated in his pretextual placement in solitary confinement on October 15, 2023. He has also shown that their retaliation is driven by his protected activities. Retaliatory causation for his retaliation claim is evaluated under "the burden-shifting framework established in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)." *Williams*, 64 F.4th at 1193 (citing *Smith*, 532 F.3d at 1278). Plaintiff Council must first show "that his constitutionally-protected speech was a 'motivating factor' [for the challenged] adverse actions." *Id.* Then the burden shifts to Defendants to show that they "would have implemented those adverse actions irrespective of [Plaintiff Council's] complaints." *Id.* There are many indications that Plaintiff Council's constitutionally protected activities were a "motivating factor" for the challenged conduct.

*Direct Statements.* Retaliatory causation can be proven through statements by the relevant prison officials that express retaliatory animus, or that refer to mistreating the plaintiff because of his protected activity. For example, in *Harper v. Admin. Lieutenant*, 857 F. App'x 551 (11th Cir.

2021), the Eleventh Circuit found retaliatory animus based on statements the plaintiff overheard from prison officials "discussing the grievance [he filed] and how they could 'get back at [him]' for filing it," and based on "additional evidence suggesting retaliatory animus as the motivation behind his termination from the law library." *Id.* at 554–55. Specifically, "two other guards smirked at Harper and stated that 'they kicked [him] out of the Law Library.'" *Id.*

Plaintiff Council has introduced many examples of such statements. The most blatant example is that Defendants blocked a plan to transfer Plaintiff Council away from Limestone because his attorney sent a demand letter, and transferring him after that would "have set bad precedent." Hrg. Tr. 56:15–57:8. Separately, Warden Streeter admitted that he initiated the October 15, 2023 incident because he saw a video of Plaintiff Council on social media—one in which Plaintiff Council was rallying prisoners to get unified to further FAM's non-violent mission. *Id.* 117:5–9; 121:22–122:2; *see also* 2020 Video from Donaldson Correctional Facility.

Lt. Pelzer has also vocalized his dissatisfaction with Plaintiff Council's efforts to expose corruption at Limestone. In August 2023, Mr. Jackson recorded a video describing how he was beaten by Limestone officers and showing his injuries, and it went viral on TikTok. *Id.* ¶¶ 2–6. The next day, "Lt. Pelzer called [Jackson] into his office and asked [him] if Robert Earl Council was behind the video being posted on TikTok." *Id.* ¶ 6. Notably, Plaintiff Council was not involved in recording or posting the video, *id.*, but Lt. Pelzer's comments demonstrate that he views Plaintiff Council as a ring leader; *see also* Council 3rd Decl. ¶¶ 18–21 (Lt. Pelzer accused Plaintiff Council of posting a video online, just because Plaintiff Council happened to be in the background); *see also* Mabry Decl. (Lt. Pelzer threatened that Plaintiff Council would "regret" the fact that he was "working on something to get [Lt. Pelzer] fucked up," in reference to Plaintiff Council exposing Lt. Pelzer's gambling ring).

*Pretext Evidence*. Plaintiff Council also presented evidence of the pretextual basis for being thrown in solitary confinement on October 15, 2023. *See supra* at 13–15. Pretext evidence, or "[p]roof that the defendant's explanation is unworthy of credence" is "one form of circumstantial evidence that is probative of [unlawful motive], and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (citation omitted). The Court "can reasonably infer from the falsity of the explanation" that Warden Streeter gave (and that is apparent from the face of the disciplinary charges) that Defendants are "dissembling to cover up a discriminatory purpose." *Id.* "Such an inference is consistent with the general principle . . . that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* (citations omitted). Plus, "inconsistencies, incoherencies, or contradictions" in Defendants' "proffered legitimate reasons for [their] action" shows pretext for an unlawful motive. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020).

Relatedly, intentional deviation from established procedures, such as the pre-filled disciplinary reports during the October 30 disciplinary proceeding, *supra* at 18, also establishes unlawful motive. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298–99 (11th Cir. 2006) (finding pretext based in part on employer's deviation from policies and failure to articulate clearly and consistently the reason for employee's discharge). Here, Sgt. Parker (the arresting officer) was not present at the disciplinary hearing, Hrg. Tr. 53:25–54:1, despite the necessity of the arresting officer's presence at a hearing, *id.* 123:1–5. And the disciplinary forms were completed before the hearing even began, *id.* 54:2–3, contrary to the required procedure, *see* Doc. 32-3.

*"Me Too" and "Other Act" Evidence*. Plaintiff Council has introduced declarations from other Limestone prisoners that qualify as "me too" or "other act" evidence, which is admissible to

establish retaliatory animus. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285–86 (11th Cir. 2008); *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 854 (11th Cir. 2009); *Fudali v. Napolitano*, 283 F.R.D. 400, 403 (N.D. Ill. 2012) ("The cases are basically uniform in holding as a general principle that discriminatory intent or the pretextual nature of an employment related decision may be proven by 'other acts' of discrimination or retaliation." (collecting cases)).

To determine the relevance of "me too" evidence Courts consider the temporal relation and "whether the same decisionmake[r] [was] involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." *Davis v. City of Lake City*, No. 3:10-cv-1170-J-34TEM, 2013 WL 12091324, at *19 (M.D. Fla. Mar. 15, 2013) (citations omitted). Plaintiff Council has introduced "me too" declarations from several similarly situated prisoners who were treated in a similar manner by Lt. Pelzer and other correctional staff at Limestone.

First, after a video of Anthony Jackson describing correctional officers' attack on him went viral, Limestone staff retaliated by fabricating disciplinary charges against Mr. Jackson and preventing him from presenting evidence at the disciplinary hearing. Jackson Decl. ¶¶ 11–13. (Lt. Pelzer assumed Plaintiff Council had posted the video. *Id.* ¶ 6.) Likewise, after Lt. Pelzer and other officers assaulted Yinessa Banks, breaking his jaw, they fabricated disciplinary charges against him, too. Banks Decl. ¶¶ 3–9. After Juan Caples began associating with Plaintiff Council and FAM, Limestone staff retaliated against him by placing him in solitary confinement. Ex. 12, Declaration of Juan Caples ¶¶ 14–22. After two of Lt. Pelzer's gang member runners assaulted and robbed A.A. (a pseudonym, to protect his identity), Lt. Pelzer protected *them* by putting A.A. in solitary confinement. *See infra* at 28–29. And after a prisoner named Jamil Salery spoke with

ADOC investigators about officer corruption at Limestone, Lt. Pelzer placed him in solitary confinement, falsified a disciplinary report and evidence against him, and lied at the disciplinary hearing. Ex. 14, Declaration of Jamil Salery ¶¶ 1–2, 6, 11. None of the witnesses Mr. Salery listed to testify in his defense—including the prisoner who was actually assaulted during the incident and would have testified other prisoners, not Mr. Salery, assaulted him—were permitted to testify at the hearing. *Id.* ¶¶ 13–19; *see also* Ex. 15, Declaration of Winfred Richards (explaining that he was attacked by a group of prisoners; that Lt. Pelzer falsely blamed Jamil Salery, who had nothing to do with the assault, for the incident and threw him in solitary confinement; and that Mr. Richards tried correcting the record with the hearing officer, who said that he would rely on the facts presented by the officer).

*Hostility to FAM*. The First Amendment protects the freedom to associate for the purpose of "petition[ing]" for the redress of grievances, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984), such as Plaintiff Council's freedom to associate with FAM for the purpose of challenging systemic constitutional violations and mistreatment across ADOC, *supra* at 5. Government retaliation against a person based on broad hostility to that person's politics or viewpoint violates the First Amendment, even if the plaintiff is unable to identify a "particularized" instance of speech that the government seeks to suppress. For example, in *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016), the Tenth Circuit held that the Planned Parenthood Association of Utah (PPAU) was likely to succeed on its retaliation claim by showing that the state denied the PPAU funding in order to generally "weaken the organization and hamper its ability to provide and advocate for abortion services." *Id.* at 1262; *see also Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270–73 (2016) (confirming that First Amendment claim can be based on perceived affiliation); *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 295–302 (6th Cir. 2012) (holding

that the plaintiffs could go to trial on the claim that their government employer retaliated against them based on their perceived political affiliation, even after finding that the employer had not retaliated against them based on particular instances of protected speech).

The record here demonstrates Defendants' general hostility to Plaintiff Council because of his organizing efforts, generally, and his affiliation with FAM, specifically. *See, e.g.*, Hrg. Tr. 118:14–17 (Warden Street accusing Plaintiff Council of belonging to "the Blood gang" when describing a video where Plaintiff Council is specifically associating himself with FAM); Council 3rd Decl. ¶ 29 (Lt. Gilbert said, "I can't wait to catch his ass. Everybody be following him like he somebody."); Caples Decl. ¶¶ 14–22 (describing how high-ranking ADOC officials retaliated for his work with FAM); Mabry Decl. So, in addition to demonstration retaliation for each specific protected activity, Plaintiff Council has also demonstrated general retaliatory animus.

### d. The *O'Bryant* Presumption Does Not Apply Here.

Defendants have argued that the *O'Bryant* presumption against prisoners' First Amendment retaliation claims based on challenge to their disciplinary sentences defeats Plaintiff Council's claim with respect to the October 15 incident. Doc. 32 at 9. In *O'Bryant*, the Eleventh Circuit held that "[i]f a prisoner is found guilty of an actual disciplinary infraction after being afforded due process *and* there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report." 637 F.3d at 1215. But by its own terms, the *O'Bryant* presumption only applies to the "arresting officer," *id.*, (in this case, Sgt. Parker), not against a Warden or Commissioner for the separate act of approving the disciplinary conviction (or enforcing the baseless discipline, here, solitary confinement). Indeed, courts have been careful to narrowly construe and limit *O'Bryant*'s holding. *See generally Mathews v. Hodgson*, No.

4:15cv618-RH/CAS, 2017 WL 1045071, at *6 (N.D. Fla. Jan. 23, 2017) (rejecting argument that the plaintiff could not challenge a disciplinary report as retaliatory because he was found guilty of the underlying charge). Nor does *O'Bryant* apply to the aspects of Plaintiff Council's claims challenging the retaliatory denial of his transfer, retaliatory violence, retaliatory subjection to solitary confinement, and retaliatory intimidation and harassment.

But even if the *O'Bryant* doctrine did apply to some piece of Plaintiff Council's First Amendment claim regarding the October 15 incident, Defendants make a critical oversight: it has two preconditions, *see id.*, neither of which is met here. The record shows that Plaintiff Council was not afforded due process, and that the evidence does not credibly support the guilty findings.

First, sham or predetermined hearings, where the prisoner is denied a meaningful chance to influence the outcome, violate the minimum requirement of due process. *See Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir. 1987) (finding violation "where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard"); *Quintanilla v. Bryson*, 730 F. App'x 738, 744 (11th Cir. 2018) (the process provided "'must be meaningful; it cannot be a sham or a pretext'") (citation omitted); *Carter v. Harris*, 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999) (finding that sham process violated due process) (citing *Adams v. Sewell*, 946 F.2d 757 (11th Cir. 1991)). As explained, *supra* at 17–18, Plaintiff Council's hearing was a sham. The evidence demonstrates that Defendants violated established protocol and accepted Sgt. Parker's narrative at face value without giving Plaintiff Council an opportunity to meaningfully challenge it.

Second, the Court must review the disciplinary finding to ensure it is not "so lacking in evidentiary support as to violate due process" or otherwise constitute an arbitrary decision. *See Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 457 (1985). A

28

disciplinary finding based on a guard's report only meet this standard if it is "credible." *Perez v. Grant*, No. 5:13-CV-8-RS-CJK, 2014 WL 752375, at *6 (N.D. Fla. Feb. 25, 2014) (citing *Hrbek v. Nix*, 12 F.3d 777, 781 (8th Cir.1993)). Sgt. Parker's report does not constitute "credible" support for the guilty finding. To start, Warden Streeter claimed he sent Sgt. Parker to do a "shake-down" of Plaintiff Council's cell to look for a contraband cell phone, but Sgt. Parker's firsthand account said he went specifically to put Plaintiff Council in solitary confinement. *Compare* Hrg. Tr. 121:22–122:8 *with* Doc. 32-3. Additionally, the allegations surrounding Plaintiff Council's alleged assault on Sgt. Parker are implausible, if not physically impossible: Plaintiff Council, who is about eight inches shorter than Sgt. Parker did not *elbow* Sgt. Parker in the chest, while his hands were restrained in handcuffs behind his back. *See supra* at 17–18.

### 2. Defendants Have Failed to Protect Plaintiff Council in Violation of the Eighth Amendment.

Plaintiff Council has also demonstrated a likelihood of success on his failure-to-protect claim under the Eighth Amendment (Count II). To show a violation of his Eighth Amendment rights, a plaintiff must typically "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

With respect to the third prong, in an injunctive case like this one, "[p]ersonal action by defendants individually is not a necessary condition." *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988). The official-capacity defendants must have just "some connection" with the challenged conduct. *Id.* (citation omitted). As this Court has previously explained, "official-capacity, injunctive-relief claims can proceed despite an absence of *any* retrospective causal connection to the defendants." *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1157 n.73 (M.D. Ala. 2016) (Thompson, J.); *see also id.* at n.74 (similarly finding that evidence of a policy or practice, typically

29

required to hold a supervisor liable for damages, is not required for injunctive relief claims). So Plaintiff Council addresses the first two elements.[13]

### a. Plaintiff Council Is at Substantial Risk of Assault or Murder.

The Eighth Amendment requires Plaintiff Council to show a "strong likelihood" of injury. *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). The evidence of Lt. Pelzer's threats and intimidation, combined with evidence of his propensity for violence and opportunity to act on his threat, show a strong likelihood of assault or murder—a risk that is exacerbated by Plaintiff Council's current protected activity through this litigation.

As explained, *supra* at 12–13, Lt. Pelzer assured gang members at Limestone that he would "make sure that don't nobody get in trouble" if they assault or murder Plaintiff Council, Hrg. Tr. 30:23–31:12, and his ominous promise occurred against a backdrop of similar misconduct, Council 3rd Decl. ¶¶ 21–27.

Indeed, Lt. Pelzer has used his unique position to afford free license to gang members who work for him to rob and assault others. As the Security Threat Group officer at Limestone, Lt. Pelzer's job is to "monitor" gangs within the prison and cultivate relationships with these gang members. Council 3rd Decl. ¶ 31; Hrg. Tr. 181:9–182:20. He does that by "being in close communication with gang members." *Id*. 183:25–184:7. He often uses gang members as runners to perform tasks *id*. 201:19–202:2; and he protects these runners when they attack or assault prisoners, A.A. Decl. ¶¶ 12–13. For example, on September 10, 2023, two prisoners who work as Lt. Pelzer's runners robbed A.A. and stabbed him repeatedly. A.A. Decl. ¶¶ 2–6. Instead of locking

---

[13] Plaintiff Council has prepared a demonstrative exhibit summarizing the formal notice Defendants have received regarding the risk of harm to Plaintiff Council at Limestone, as well as the violence and intimidation he has been subjected to since returning to Limestone in December 2021. *See* Ex. 19.

up and disciplining A.A.'s assailants, Lt. Pelzer put A.A. in solitary confinement because it was "easier." *Id*. ¶¶ 7–13. A.A. was also charged with assaulting the prisoners, even though the exact opposite happened. *Id*. ¶ 11; *see also* Salery Decl. ¶¶ 11–18 (Lt. Pelzer falsely blamed Mr. Salery for assaulting Mr. Richards and falsely testified about the evidence); Richards Decl. ¶¶ 4–6; 16–17 (recounting how Lt. Pelzer falsely accused Mr. Salery of assaulting him to justify putting Mr. Salery in solitary confinement). These incidents highlight for Plaintiff Council the extreme dangerousness of being at odds with Lt. Pelzer: Lt. Pelzer, while incentivizing other prisoners to assault or kill him, will ignore video evidence and falsify incident reports to protect the prisoners willing to do his bidding. Council 3rd Decl. ¶¶ 36–37.

Contrary to Defendants' suggestion, Doc. 32 at 16, the fact that Plaintiff Council is currently in restrictive housing does not protect him from Lt. Pelzer. Lt. Pelzer does not need direct or personal access to Plaintiff Council to harm him, given his relationships with the gang members serving as his runners. And the prison's imbalanced officer-to-prisoner ratio increases the likelihood that other prisoners may have the opportunity to harm Plaintiff Council. In the most recent ADOC quarterly staffing report filed in pending litigation, ADOC reported that Limestone had 321.24 officers assigned to the prison, but only 101 officers actually working there. Quarterly Correctional Staffing Report, *Braggs v. Dunn*, 2:14-cv-00601 (M.D. Ala. Dec. 1, 2023) (Doc. 4094-1). Because "[t]here are no correctional officers present or manning their posts inside the dormitories" at Limestone, Plaintiff Council faces an increased risk of being assaulted by other prisoners. Council 3rd Decl. ¶ 38.

The threats against Plaintiff Council are also serious given the rampant culture of officer-on-prisoner physical assaults at Limestone and corresponding refusal of the administration (including Warden Streeter) to hold officers accountable. Between July and September 2023, at

least five Limestone prisoners were assaulted by correctional officers. *See* Council 1st Decl. ¶ 17–19. None of the officers involved in these assaults have been investigated, let alone disciplined. For example, even though Anthony Jackson's attorney requested that a Limestone official take a statement from him regarding his assault by officers, no action has been taken. Jackson Decl. ¶¶ 16–18. Similarly, even after Lt. Pelzer climbed on top of and repeatedly punched Yinessa Banks in full view of countless witnesses and other correctional officers, Banks Decl. ¶¶ 4, 17, Lt. Pelzer has never "been disciplined for a use of force at Limestone." *Id*. ¶ 17; Hrg. Tr. 187:8–10.

What's more, Warden Streeter has directly demonstrated his willingness to cover for the misconduct of Lt. Pelzer and other Limestone correctional officers. Even though Anthony Jackson's attorney alerted Warden Streeter that there was a pattern and practice of Limestone officers attacking prisoners, Warden Streeter did not investigate the assault on Mr. Jackson. Jackson Decl. ¶ 18; Ex. 15, September 13 and 14, 2023 Letters to Warden Streeter. And Warden Streeter has on multiple occasions approved false disciplinary charges against Plaintiff Council. *See supra* at 18–19. He has also exhibited his own desire to suppress Plaintiff Council's organizing, as evidenced by his October 15, 2023 retaliatory placement of Plaintiff Council in solitary confinement. *See supra* at 13–15.

**b. Defendants Are Deliberately Indifferent.**

To be deliberately indifferent a prison official must know of and disregard "an excessive risk to [a prisoner's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Deliberate indifference to a correctional officer attempting to have a prisoner murdered or assaulted is an "obvious" violation of the Eighth Amendment, which "amounts to gratuitous infliction of 'wanton and unnecessary' pain that

[Supreme Court] precedent clearly prohibits." *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002); *see also* Doc. 3-1 at 5–6 (summarizing deliberate indifference standard for failure-to-protect claims).

Relevant here, when a prison official receives notice of a credible threat to assault or kill a prisoner, whether the threat was made by another prisoner, or worse, by an officer; the Eighth Amendment requires that reasonable protective measures be taken for the prisoner's safety. *See Rodriguez v. Sec'y, Dep't of Corr.*, 508 F.3d 611, 618–19 (11th Cir. 2007) (finding sufficient awareness to trigger Eighth Amendment protection when the plaintiff "on at least two occasions, told [defendant] that he feared a gang member might kill him" because of "the threat made against [his] life"); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101 (11th Cir. 2014) (summarizing facts demonstrating deliberate indifference, including the plaintiff told the defendants that he "feared for his life if he was returned to a cell with [his cellmate]" and the officers were aware that his cellmate had previously started a fire in their cell); *Scott v. Miami Dade Cnty.*, 657 F. App'x 877, 883 (11th Cir. 2016) (*Caldwell* "makes clear" that the defendant officers were required to provide protection after the plaintiff informed them "verbally and in writing" that he feared for his safety, given a history of threats and violence against the plaintiff).

Plaintiff Council has utilized every avenue possible to alert Defendants to the risk of harm posed by correctional staff at Limestone, including Lt. Pelzer, and tacitly authorized by Warden Streeter. On multiple occasions, his lawyers wrote letters to high-ranking ADOC officials. Docs. 3-3 (November 6, 2023 letter to Commissioner Hamm) & 3-6 (April 10, 2023 letter to Commissioner Hamm; January 9, 2020 letter to Cheryl Price and Commissioner Dunn). His lawyer also made a report to LESD in September 2023, after which Plaintiff Council personally reported the threats to LESD Agent Pollard. Council 3rd Decl. ¶ 41; Hrg. Tr. 78:12–79:5

Despite this, witness after witness at the preliminary injunction hearing confirmed that they have not taken any concrete steps to investigate the risk of harm to Plaintiff Council, let alone take corrective action. Commissioner John Hamm did not read any of the letters addressed to him regarding Plaintiff Council's concerns. Hrg. Tr. 176:7–10; 176:16–177:7. Nor did ADOC's legal department, whom he testified is responsible for reviewing his correspondence, Hrg. Tr. 175:22–176:6; 176:16–177:5, take any action. Even when Commissioner Hamm learned of this lawsuit, he did not investigate why a prisoner was accusing Limestone staff of subjecting him to a substantial risk of serious harm—despite the fact that the Department of Justice has sued him for, among other things, excessive force and failure to protect. *See infra* at 36–37. He did not even read the complaint. Hrg. Tr. 177:23–24.

LESD has not done anything either: after Agent Pollard interviewed Plaintiff Council, she told her supervisor about Plaintiff Council's serious concerns but did not open investigation Hrg. Tr. 79:16–18, even though she has the power to do so, *id.* 81:4–12.

Similarly, not only has Warden Streeter failed to take reasonable protective measures, he has played an active role in facilitating an unsafe and retaliatory environment for Plaintiff Council. Most recently, he spearheaded the retaliatory placement of Plaintiff Council in solitary confinement. *See supra* at 13–15. He has also knowingly approved fabricated disciplinary reports against Plaintiff Council on a number of occasions. Council 3rd Decl. ¶¶ 7–15; *supra* at 18–19. On that note, he could have (and should have) reviewed the video footage of the October 15 incident before approving the fabricated disciplinary charge, but he did not do so. *See* Hrg. Tr. 150:3–151:10; *see also id.* 207:13–23.

And though Warden Crabtree appeared to have taken some steps to protect Plaintiff Council by asking Ms. Obenchain to conduct a transfer inquiry, ADOC officials in Montgomery

blocked the transfer, citing an apparently pretextual justification. *See supra* at 9–10. According to Ms. Obenchain, ADOC cannot transfer Plaintiff Council to St. Clair without simultaneously transferring Melvin Ray to Limestone because the two are designated "enemies," Hrg. Tr. 96:14-97:17; 133:11–18, notwithstanding the uncontested evidence that they are not, in fact, enemies, *see supra* at 10 n.4.[14] To the contrary—together, they co-founded FAM. Perhaps most egregiously, Limestone officials stopped the process of transferring Plaintiff Counsel away from Limestone in direct response to a demand letter from Plaintiff Council's attorney, doubling down on their deliberate indifference.

Defendants—particularly Warden Streeter and Warden Crabtree—have also demonstrated their deliberate indifference by shrugging their shoulders in response to Plaintiff Council's years-long attempts to shed light on Lt. Pelzer's misconduct. *Austin v. Hopper*, 15 F. Supp. 2d 1210 (M.D. Ala. 1998) (Thompson, J.), an injunctive relief claim against the Commissioner of ADOC for use of the hitching post, is instructive. There, the Court was "firmly convinced" of the personal deliberate indifference of the Commissioner based on his testimony "at the evidentiary hearing that he did not discipline the warden at Holman for violating" an applicable ADOC regulation, "nor could he identify any correction officers who had been disciplined for violating" it. *Id.* at 1262. Similarly, here, the Limestone wardens have taken no steps to investigate or discipline Lt. Pelzer. Hrg. Tr. 185:5–187:18 (Lt. Pelzer testifying that he was recently disciplined for mishandling contraband and the last time he was disciplined before that was in 2010); *see also Keith v. Koerner*, 843 F.3d 833, 846 (10th Cir. 2016) (finding a warden deliberately indifferent to

---

[14] ADOC officials engaged in similar retaliation to suppress Juan Caples, another prisoner who organizes with FAM. Caples Decl. ¶¶ 11–14. After a series of retaliatory transfers, they placed him in solitary confinement for more than two years because he allegedly had an enemy in the general population. *Id.* ¶¶ 15–22. Ms. Obenchain told him she did not know why he was in solitary confinement for so long but that "the decision was made over her head." *Id.* ¶ 20.

sexual misconduct by his officers, where there was "little threat of investigation or discipline for inappropriate sexual behavior" with prisoners and the warden's "most common response was to deem the allegations unsubstantiated whenever the employee denied them"); *Fisher v. Koehler*, 692 F. Supp. 1519, 1551–58 (S.D.N.Y. 1988) (similar); *Leary v. Livingston Cty.*, No. 03-60021, 2006 WL 2865213, at *9 (E.D. Mich. Oct. 5, 2006), *aff'd in part, rev'd in part*, 528 F.3d 438 (6th Cir. 2008) (similar).

Defendants are also deliberately indifferent because they know "about the general propensity of violence" against prisoners but "did not take steps to neutralize" Lt. Pelzer, Officer Brewer, Sgt. Parker, or any of the other Limestone correctional officers. *Mathews v. Crosby*, 480 F.3d 1265, 1268, 1275 (11th Cir. 2007). In particular, Defendants are on notice that ADOC's correctional officers systemically engage in the very practices that Plaintiff Council fears will cost him his life. In 2019, the United States Department of Justice (DOJ) found that "the uses of excessive force occurring within Alabama's prisons give rise to systemic unconstitutional conditions"; "correctional officers often use force as punishment or retribution"; "correctional officers use chemical spray inappropriately"; and "uses of force are inadequately addressed by ADOC." United States Department of Justice Civil Rights Division, *Investigation of Alabama's State Prisons for Men*, at 1, 14–15, 18 (July 23, 2020), https://bit.ly/3Tia75A. DOJ then sued ADOC for, among other things, a systemic use of excessive force and a failure to protect individuals from prisoner-on-prisoner violence. *See* Second Amended Complaint at ¶¶ 37–44, 194–204, *United States of America v. Alabama, Alabama Dep't of Corr.*

Simply put, each of the Defendants has good reason to take seriously Plaintiff Council's complaints against Lt. Pelzer, Sgt. Parker, Officer Brewer, and other Limestone correctional staff, as well as his fears that other prisoners may assault him. Yet Defendants have utterly failed to act.

## B.   Plaintiff Council Has Demonstrated Irreparable Harm.

Plaintiff Council is facing irreparable harm on both his First Amendment and Eighth Amendment claims. The harm is "neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176. In fact, it is ongoing. He continues to suffer retaliatory placement in solitary confinement—an ongoing constitutional injury. And he remains under substantial threat of being assaulted or murdered by Limestone correctional officers or at their behest.

### 1.   Plaintiff Council's Ongoing Retaliatory Placement in Solitary Confinement Is an Ongoing and Irreparable Constitutional Violation.

Preliminary relief is necessary to cure irreparable harm because Plaintiff Council has demonstrated retaliation under the First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Stated differently, the "chill" from a defendant's retaliation against a plaintiff "provides the critical irreparable injury" for injunctive relief on a First Amendment retaliation claim, "regardless of whether actual chill is proved." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). "In short, irreparable harm is not difficult to establish when the impairment of First Amendment rights is at issue." *Butler v. Alabama Jud. Inquiry Comm'n.*, 111 F. Supp. 2d 1224, 1239 (M.D. Ala. 2000).

Legally speaking, Plaintiff Council has indeed been chilled. The most salient example is his ongoing retaliatory subjection to solitary confinement, along with Defendants' refusal to transfer him away from Limestone because of his protected activity. *See supra* at 10–11; 13–14. The wrongful loss of liberty flowing from his placement in solitary confinement also satisfies the "irreparable injury" requirement for a preliminary injunction. *See United States v. Washington*, 549 F.3d 905, 917 & n.17 (3d Cir. 2008) (recognizing that the "potential for excess prison time" is irreparable injury); *Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302, 310 (D.N.J.

2003) (finding irreparable harm where plaintiff was currently incarcerated because "this is a harm which cannot be redressed following a trial").

### 2. Plaintiff Council Faces a Substantial Likelihood of Assault or Murder.

"That any deadly harm suffered by Plaintiff [Council] would be 'irreparable' is undisputed here." *Mitchell v. Baker*, No. 13-cv-0860-MJR-SCW, 2015 WL 278852, at *5 (S.D. Ill. Jan. 21, 2015); (citing *Helling v. McKinney,* 509 U.S. 25, 33 (1993) (the Eighth Amendment "protects against future harm to [prisoners]"; "It would be odd to deny an injunction to [prisoners] who plainly proved [a] life-threatening condition in their prison on the ground that nothing yet had happened to them.")). The "irreparable harm" requirement does not require Plaintiff Council to show that he will definitively be assaulted or murdered tomorrow absent injunctive relief: it is satisfied if he shows a "substantial likelihood that he will suffer" irreparable injury. *Siegel*, 234 F.3d at 1176 n.9 (relying on *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)); *see also Wall v. Ferrero*, 142 F. App'x 405, 407 (11th Cir. 2005); *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *16–17 (11th Cir. Apr. 15, 2022) (upholding preliminary injunction based on a finding of a "substantial risk of irreparable harm" to a prisoner).

Plaintiff Council has carried this burden. He has demonstrated that Lt. Pelzer has told multiple gang members that he will protect them if they kill Plaintiff Council. *Supra* at 12–13. Plaintiff Council has also shown that Lt. Pelzer protected gang members at Limestone after they stabbed another prisoner repeatedly, *supra* at 30–31, which demonstrates Lt. Pelzer's opportunity, intent, and preparation, plan, and knowledge, *see* Fed. R. Evid. 404(b)(2). And Lt. Pelzer has manufactured anger against Plaintiff Council by publicly blaming Plaintiff Council for a prison-wide deprivation of commissary, planting the seeds for vengeful violence. Council 3rd Decl. ¶ 20. Lt. Pelzer has also evaded accountability for assaulting prisoner Yinessa Banks, Banks Decl. ¶ 4,

and directly retaliated against another prisoner—Anthony Jackson—for his participation in this lawsuit, Jackson Decl. ¶¶ 30–32, demonstrating that Lt. Pelzer remains a risk.

Under the Eighth Amendment, threats, like Lt. Pelzer's, that were made months earlier can establish a risk of irreparable harm. For instance, in *Melendez* (an Eighth Amendment challenge to prolonged solitary confinement), the Eleventh Circuit upheld the finding that the prisoner was at "substantial risk of irreparable injury" because the plaintiff had, *in the past*, "engaged in multiple acts of self-harm," which "can result in death." *Melendez*, 2022 WL 1124753, at *16–17. In so doing, it squarely rejected the defendants' argument that there was no current or imminent harm because the plaintiff had not engaged in self-harm for three months before the preliminary injunction was granted. *Id.* It also rejected the defendants' argument that the plaintiff had not shown irreparable harm because the district court had found that "death may not be probable based on [his] history and mental health assessments." *Id.*; *see also Thomas v. Bryant*, 614 F.3d 1288, 1318–19 (11th Cir. 2010) (demonstrating that an unconstitutional condition of confinement that poses an ongoing risk of serious injury or assault establishes the requisite risk of irreparable injury under the Eighth Amendment even in the absence of an actual assault).

Courts have also found irreparable harm where, like here, the plaintiff had previously been attacked and subjected to threats of future violence. In *Hoskins v. Dilday*, No. 16-CR-334-MJR-SCW, 2017 WL 951410 (S.D. Ill. Mar. 10, 2017), the court found that the prisoner faced irreparable harm if he remained at Menard, a prison facility where he had been attacked by several officers and threatened with future physical harm and mistreatment. *Id.* at *6. ("Without an injunction requiring Plaintiff to be transferred to another correctional institution, there is a strong likelihood that he faces irreparable harm in the form of continued, serious threats to his health, safety, and well-being and the denial of basic necessities."); *see also id.* at *7 (finding that the

injunction satisfied the PLRA because "relief less intrusive than mandating [the plaintiff's] transfer would not be effective in protecting [him]"). Similarly, in *White v. Jindal*, No. 13-15073, 2014 WL 1608697 (E.D. Mich. Apr. 22, 2014), the court found that the prisoner would suffer irreparable harm absent a preliminary injunction ordering his transfer to another facility where the prisoner claimed that he was beaten by other prisoners and "warned that he would be beaten further if he did not provide 'protection money.'" *Id.* at *6.

Lt. Pelzer's behavior toward Anthony Jackson—depriving him of basic necessities in violation of the Eighth Amendment—because of his support for Plaintiff Council's lawsuit also bolsters the finding that Plaintiff Council will suffer irreparable harm if he remains at Limestone. *See, e.g.*, *Tay v. Dennison*, 457 F. Supp. 3d 657, 686–88 (S.D. Ill. 2020) (finding irreparable harm on prisoner's claim that she was at risk of sexual assault and harassment, in part because the "staff at [her current prison] continue to taunt and antagonize her, including about this lawsuit").

## C. The Third and Fourth Preliminary Injunction Factors Also Weigh in Plaintiff Council's Favor.

The Supreme Court has recognized that the third and fourth factors, harm to the opposing party and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [practice]." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137, 1174 (N.D. Fla. 2022), *judgment vacated in part, appeal dismissed as moot*, No. 22-10448-GG, 2023 WL 5051221 (11th Cir. Mar. 20, 2023) ("Furthermore, the public and the State have no interest in enforcing a likely unconstitutional policy.").

Here, Plaintiff Council's placement in solitary confinement at Limestone is retaliatory, justified by pretext, and unconstitutional. And the protection Plaintiff Council seeks vastly

outweighs any *de minimis* administrative burden for Defendants to transfer Plaintiff Council. *See Tay*, 457 F. Supp. 3d at 688 ("The Court will only direct Defendants [to] do their job: protect Plaintiff from abusive staff and prisoners and house [him] appropriately based on an *individualized determination* of [his] needs."). Indeed, Defendants' motivations seem to be silencing an effective prison organizer—and as Ms. Obenchain's transfer inquiry and Lt. Howell's admissions confirm, there is no legitimate penological need for Plaintiff Council to be in solitary confinement or to remain at Limestone.

Lt. Pelzer's conduct toward Plaintiff Council also demonstrates the need for an injunction because "the public has a strong interest in ensuring that is corrections officers obey the law, and society's interest in enforcing constitutional bounds is also heavy." *Mitchell*, 2015 WL 278852, at *7. A preliminary injunction is necessary to protect Plaintiff Council from "a continued, serious threat of constitutional harm, both in the form of First Amendment-violating retaliation . . . and brute force," because Lt. Pelzer has engaged in "constant harassment (including threats [he] will have other [prisoners] assault Plaintiff)," as well as post-filing harassment by referring the plaintiff's lawsuit against him." *Id.* at *1, *7. Simply stated, "*failing* to order a transfer on this record would undermine the public's interest in the Court's enforcement authority." *Id.*

### D.   Defendants' Evidentiary Objections Are Meritless.

At the preliminary injunction hearing, Defendants repeatedly made hearsay objections during witness testimony. But a number of these statements are admissions by a party opponent and evidence of state of mind. And regardless, at the preliminary injunction stage, a court can rely on hearsay statements and declarations that would be inadmissible for a permanent injunction, "if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (cleaned up). "The

dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence [is] appropriate[.] *Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986); *see also Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558–59 (5th Cir. 1987) (upholding grant of preliminary injunction based on hearsay documents alone). The attendant factors here demonstrate that the Court should consider the hearsay statements Plaintiff Council has introduced.

*Comments Regarding Transfer.* As discussed above, *see supra* at 10–11, Lt. Howell and Cpt. McKenzie recently told Plaintiff Council that Limestone was working on transferring him, but that Limestone blocked the plan in response to the demand letter from his attorney. These statements are not hearsay because they are admissions of a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A). They are also admissible evidence of mental state or animus, as they demonstrate Defendants' intent to retaliate against Plaintiff Council for sending a demand letter. *See Macuba v. DeBoer*, 193 F.3d 1316, 1323-24 & n. 15 (11th Cir. 1999). And, hearsay or not, the statements are admissible "given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985.

*Threats By Officers.* Plaintiff Council credibly recounted his conversation with the gang members who warned him that Lt. Pelzer was trying to incentivize them to assault or kill Plaintiff Council. *See supra* at 12–13. He provided their "prison names," but could not provide their legal names. Hrg. Tr. 68:9–69:10. And given the challenges of securing a declaration or testimony from prison gang members, particularly in an expedited proceeding, Plaintiff Council was unable to get them on record admitting that Lt. Pelzer solicited them to commit murder in exchange for the release of their friend from solitary confinement, *see id.* "[W]eighing all the attendant factors,"

*Asseo*, 805 F.2d at 26, Plaintiff Council's hearsay testimony about his conversation with the gang members is properly considered at this stage.

As for Lt. Pelzer's underlying statements, they are admissible to show Defendants' state of mind and their ongoing retaliatory animus. *See Macuba*, 193 F.3d at 1323–24 & n. 15. And because the statements reflect Lt. Pelzer's active recruitment of prisoners to kill Plaintiff Council, "in furtherance of [a] conspiracy," they are admissible under the conspiracy exception to the hearsay rule. *See City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 558–59 (11th Cir. 1998); Fed. R. Evid. 801(d)(2)(E). The same analysis applies to Plaintiff Council's testimony regarding statements from other officers reflecting retaliatory violence, *see supra* at 12.

### E.     The Proposed Injunction Meets the PLRA Requirements.

Contemporaneously with this brief, Plaintiff Council is submitting an amended proposed preliminary injunction. *See* Amended Proposed Order. He specifies that the injunctive relief sought—a transfer away from Limestone and a release from solitary confinement for the duration of the lawsuit—should be ordered against Commissioner Hamm. This relief, geared at a single defendant and limited to ending Plaintiff Council's retaliatory placement in solitary confinement and protecting him from the substantial threat of irreparable harm at Limestone, is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(2).; *see also Hoskins*, 2017 WL 951410, at *7 (entering preliminary injunction ordering prison director to transfer plaintiff to a different prison facility for the pendency of the case).

## CONCLUSION

For these reasons, the Court should grant Plaintiff's Motion for Injunctive Relief and enter the requested preliminary injunction. *See* Amended Proposed Order.

Respectfully submitted this 14th day of December, 2023.

/s/ John P. Batson
John P. Batson
Georgia Bar No. 042150
*Pro Hac Vice*
1104 Milledge Road
Augusta, GA 30904
706-737-4040
jpbatson@aol.com

/s/ Andrew Menefee
Andrew Menefee
**MENEFEE LAW**
Alabama Bar No. 1529W23S
1250 Connecticut Ave NW Ste. 700
Washington D.C., 20036
202-381-0143
amenefee@menefee-law.com

/s/ Sumayya Saleh
Sumayya Saleh
Civil Rights Corps
D.C. Bar No. 1743427
*Pro Hac Vice*
1601 Connecticut Avenue, NW
Suite 800
Washington, DC 20009
202-844-4975
sumayya@civilrightscorps.org

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2023, I filed this Plaintiff's Supplemental Brief in Support of His Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users:

Cameron Wayne Elkins
Hunter Layne Sims
Tara S. Hetzel
Alabama Attorney General's Office
501 Washington Ave
Montgomery, AL 36130
cameron.elkins@alabamaag.gov
hunter.sims@alabamaag.gov
cameron.elkins@alabamaag.gov

*/s/ Sumayya Saleh*
Sumayya Saleh