IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBERT EARL COUNCIL,                    )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        CIVIL CASE NO. 2:23-cv-658-ECM
                                        )                      [WO]
COMMISSIONER JOHN HAMM, *et al*.,       )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION and ORDER

## I. INTRODUCTION

This matter is before the Court on Plaintiff Robert Earl Council's ("Council")
motion for preliminary injunctive relief, (doc. 3), wherein Council seeks an order
instructing Defendant John Hamm, as Commissioner of the Alabama Department of
Corrections ("ADOC"), to release Council from restrictive housing[1] and transfer him to
another ADOC correctional facility (*see* doc. 51-1 (revised proposed order granting
preliminary injunction)).[2]  The Defendants filed a response to Council's motion, and the
Court held an evidentiary hearing on November 30, 2023.  The parties subsequently filed
post-hearing briefs.  In addition, the Defendants filed a motion to exclude certain evidence

---

[1] Council refers to this as "solitary confinement," but ADOC officially recognizes these units as "restrictive housing," and the Court will refer to it as such. (*See* doc. 50 at 146).

[2] Council initially requested a litany of other items, including the suspension of Lt. Jeremy Pelzer and enjoining the Defendants from serving Council with a disciplinary violation without consulting a panel of three professionals. (Doc. 3 at 18–20).  These requests were subsequently narrowed.

from the Court's consideration on whether to issue a preliminary injunction (doc. 57), to which Council filed a response (doc. 60).

Council filed this lawsuit on November 10, 2023, concerning his incarceration at Limestone Correctional Facility ("Limestone"). (Doc. 67 (second amended complaint)). In his second amended complaint, Council brings four claims against the Defendants: (1) retaliation in violation of the First Amendment to the United States Constitution ("Count One"); (2) failure to protect in violation of the Eighth Amendment to the United States Constitution ("Count Two"); (3) unlawful conditions of confinement in violation of the Eighth Amendment to the United States Constitution ("Count Three"); and (4) a violation of his right to procedural due process under the Fourteenth Amendment to the United States Constitution in connection with Council's confinement in restrictive housing ("Count Four"). (*Id.* at 26–40). Council represented at the November 30, 2023 evidentiary hearing that he seeks preliminary injunctive relief based on Counts One and Two.

For the reasons that follow, Council's motion for a preliminary injunction (doc. 3) and the Defendant's motion to exclude (doc. 57) are due to be DENIED.

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### III.  BACKGROUND[3]

#### A.  Statutory Background

The Prison Litigation Reform Act of 1995 ("PLRA") was enacted to limit the judiciary's reach into the management of prisons and to expedite prison litigation. *See generally* 18 U.S.C. § 3626.  To that end, the PLRA provides strict parameters under which courts can issue prospective relief when civil litigants challenge prison conditions:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

The PLRA provides further requirements for any preliminary injunctive relief entered by courts:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall

---

[3] "When ruling on a preliminary injunction, 'all of the well-pleaded allegations [in a movant's] complaint . . . are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 2021 WL 2668810, at *1 (M.D. Ala. June 29, 2021) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).  In addition to the factual allegations in Council's complaint, the Court also considered the evidence presented at the November 30, 2023 evidentiary hearing and in the parties' supplemental briefing.

give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

*Id.* at § 3626(a)(2).

Therefore, any preliminary injunction entered in a prison litigation case, such as the present case, is to be narrowly tailored and limited in duration with a statutory maximum of ninety days. With this statutory background in mind, the Court proceeds to the specifics of Council's case.

### B. Factual and Procedural Background[4]

#### 1.    *General Background and Prior Litigation*

Council is an inmate in Limestone serving a life sentence, which he began serving in 1995. Also known as "Kinetek Justice," Council is a prison activist who is well-known for leading various labor strikes throughout the ADOC system, speaking to the media regarding prison conditions, and advising other inmates regarding their rights. (Doc. 67 at 3–4).

Of course, Limestone is not Council's first stop in ADOC. Council previously

---

[4] The facts recited herein are not exhaustive of the facts presented in the parties' filings, evidentiary submissions, and the November 30, 2023 evidentiary hearing; however, the Court presents the facts, in a narrative format, which it finds relevant in ruling on Council's motion.

served stints in Holman Correctional Facility ("Holman"), Kilby Correctional Facility ("Kilby"), and William E. Donaldson Correctional Facility ("Donaldson"). This is also not Council's first lawsuit in connection with his tenure at Limestone. In a 2020 lawsuit filed in the Northern District of Alabama,[5] Council alleged that after his transfer to Limestone, he contacted media outlets about abuse and a gambling and extortion operation by prison officials. Council also assisted fellow inmate Travis Griggs in filing a lawsuit against Lt. Jeremy Pelzer ("Pelzer"). According to Council's complaint in that case, Pelzer told another inmate that if Council did not stop trying to get him fired, that Council would regret it because Pelzer knew where Council's girlfriend lived. Pelzer then allegedly told inmate Larry Jones ("Jones") to place Council on his enemy designation list in an effort to get Council transferred. Pelzer also allegedly gave Officer Dustin Brewer ("Brewer") five strips of paper which contained flakka, a synthetic drug, and instructed him to "find" the paper in Council's cell. Brewer did so, and Council was served two disciplinaries for possessing the paper and for distributing drugs for the STF 62 Brim organization,[6] according to a "coerced affidavit" by Jones. As a result, Council was held in segregation for seven months and stripped of phone and visitation privileges for 150 days. Council then filed multiple complaints with various ADOC officials regarding these events, but no action was taken. Ultimately, summary judgment was granted in full for the defendants.

---

[5] *Council v. Pelzer*, 2021 WL 6881484 (N.D. Ala. Dec. 14, 2021), *report and recommendation adopted sub nom.*, 2022 WL 419577 (N.D. Ala. Feb. 10, 2022).

[6] STF 62 Brim is recognized as a security threat group (or a "gang") within ADOC.

In May 2020, Council was transferred out of Limestone.

Council eventually found himself at Donaldson.  There, according to Council, on January 30, 2021, four officers entered Plaintiff Council's cell, beat him until he was unconscious, and left him for dead.  Council was airlifted to University of Alabama at Birmingham ("UAB") hospital and rendered permanently blind in his left eye.  This incident is the basis of a civil suit in the Northern District of Alabama in which defendant ADOC officials and employees were dismissed prior to the commencement of discovery.[7] In addition, there is an ongoing criminal prosecution in the Circuit Court of Jefferson County, Alabama.[8]  During his recovery from the January 2021 incident, Council was housed in Kilby.  Thereafter, in December 2021, Council arrived back at Limestone where he was immediately placed in restrictive housing for disciplinary reasons which Council disputed.

At this juncture it is important to note that Council provides an extensive recitation of events from December 2021 through spring of 2023 in his operative complaint (*see* doc. 67 at 7–20); however, for the limited purposes of deciding Council's motion for a preliminary injunction, the Court will dispense with reciting these facts at this point of the litigation.

---

[7] *Robert Earl Council v. Wexford Health Services, Inc.*, 2:22-CV-008, (N.D. Ala. July 28, 2023).

[8] *State of Alabama v. Cordaro Dewaymus Melton*, 68-CC-2022-928, (Ala. Cir. Ct. Jan. 4, 2024).

### 2.      *Events Subject to the Present Action*

By spring of 2023, ADOC officials and employees were made aware of Council's fear for his safety, including classification and mental health staff at Limestone (doc. 67 at 18), and higher ADOC officials to whom Council's then-attorney wrote a letter, dated April 10, 2023 (doc. 3-6 at 2–3).

As summer began, matters escalated for Council.  In his operative complaint, Council alleges that "[s]ometime between May 24, 2023 and June 14, 2023, Lt. Pelzer made a statement to another prisoner that 'Robert Earl is the reason Lewis (head of the Crips [gang]) can't get out,' and '[e]ven if y'all killed him I'll make sure nothing happens to y'all.'" (Doc. 67 at 12).  Then, "[o]n June 28, 2023, Lt. Pelzer told other prisoners, that 'Robert Council posted a live [referring to live stream] and that's why y'all can't catch store [(purchase items from the commissary)].'" (*Id.*).  Council alleges that several people heard this statement but puts forth no names.  Council's concern was that "[t]his was a type of collective punishment that had never been done before and it made Plaintiff Council a potential target for any prisoner aggrieved at being denied access to commissary." (*Id.*).

Council then alleges further incidents, such as, "[o]n June 20, 2023, an Officer Charley at Limestone stated to Plaintiff Council, 'What you looking at? That's why you lost a [sic] eye at West Jefferson,' in reference to a previous assault by correctional officers that left [Council] blind in one eye."[9] (*Id.*).  And, in late June of 2023, "another prisoner

---

[9] This particular allegation was first presented in Council's December 14, 2023 supplemental briefing, rather than in the initial complaints or at the November 30, 2023 evidentiary hearing.

told [Council] that he had just seen Lt. Gilbert.  This prisoner said that Lt. Gilbert referred to [Council] while gritting his teeth, 'I can't wait to catch his ass.  Everybody be following him like he somebody.'" (*Id.* at 13).

Fall of 2023 was no better for Council.  Warden William Streeter ("Warden Streeter") testified at the November 30, 2023 evidentiary hearing that he received an email in October 2023 from the Law Enforcement Services Division ("LESD") of ADOC wherein LESD shared a TikTok video depicting Council and other inmates making statements directed at fellow inmates. (Doc. 50 at 117–20).  Based on the surroundings in the video, Warden Streeter determined that the video was not made at Limestone; however, Warden Streeter believed the video might have been uploaded to Facebook via a contraband cellphone in the possession of Council. (*Id.* at 119–20).  According to this same testimony, Sergeant Steven Parker ("Parker") was instructed by Warden Streeter to search Council's cell for this contraband cellphone. (*Id.* at 119).

The report of the incident filed by Parker tells a slightly different story of the search's genesis.  Parker's narrative on his disciplinary report filed in connection with the incident states:

> On October 15, 2023, I, Sergeant Steven Parker, was instructed to place inmate Robert Council B/ 181418 in Restrictive Housing for Rule Violation #529- Unauthorized participation in social networking. I gave a direct order for inmate Council to place inmate Council[']s hand to the rear to be placed in handcuff[s]. Inmate Council refused all orders to be handcuffed. I administered a burst of Sabre Red to the facial area of inmate [C]ouncil. I placed inmate Council in handcuff[s] to the rear. Inmate Council continued being disorderly. While I was escorting inmate Council, inmate

Council pulled away. Inmate Council then delivered a strike with inmate Councils elbow into my chest. I grabbed inmate Council and continued the escort out of the Housing Unit.

(Doc. 32-3 at 1).

Council, of course, disputes this version of events.   In his operative complaint,

Council offers this narrative instead:

Executing Warden Streeter's directive, on October 15, 2023, in I dorm at 10:45 a.m. Officer Steven Parker and Officer Brewer entered Plaintiff Council's cell and announced that they were placing him in solitary confinement because he had allegedly violated ADOC's social media policy. Plaintiff Council hesitated and asked, "For what?".

[] Officer Parker immediately raised a canister of SABRE Red cell buster pepper spray and sprayed Plaintiff Council in the face, even though it is a "cell extraction tool" that is supposed to be sprayed into a cell, not directly on a prisoner. Plaintiff Council turned his head, and the chemicals burned his face and went into his left ear. The entire incident, from the initial command to turn around to the use of chemical spray, lasted eight to ten seconds.

[] This assault was excessive because Plaintiff Council remained non-violent and made no threat towards the officers.

[] After he had been taken to the health care unit to be treated for OC spray, Plaintiff Council pointed out to the officers that prisoner Derrol Shaw was visible in the video—Shaw became famous in August 2023 for single-handedly taking over Donaldson Correctional Facility and was not at Limestone, refuting the suggestion that Plaintiff Council had just recently filmed and posted this video. In addition, the light fixtures in the video were different than those installed in the Limestone dormitories. After Plaintiff Council demonstrated factually why the disciplinary charge against him was false, the correctional officers still charged Plaintiff Council with violating ADOC's social media policy [. . .]

9

> Plaintiff Council told the officers that he had not touched the
> officers and that the officers did not have body charts, medical
> records showing that the officers suffered injuries.

(Doc. 67 at 9–10).

On October 30, 2023, Council was called to a disciplinary hearing on four charges stemming from the October 15, 2023 incident: (1) assault on an officer; (2) unauthorized participation in social networking; (3) failure to obey a direct order; and (4) violation of state and federal law. (Docs. 32-3–6).   Council testified that once he arrived for this hearing, he saw that the disciplinary violation forms on the table in front of the hearing officer were already filled out and that Parker (the charging officer) was absent. (Doc. 50 at 53–54).   Council, at the evidentiary hearing, explained:

> I was approached by officers requesting whether or not I
> wanted to go to the disciplinary hearing. I told them I did. As I
> went down to the disciplinary proceeding, I noticed that the
> arresting officer wasn't there. There was just the hearing
> officer. And he had these disciplinaries laid out on the table
> that were already typed up and filled out. So I stated to him
> that, I don't think you need me here. As a matter of fact, I just
> need my toilet fixed. Then I was returned to my cell and my
> toilet was fixed. And I don't know what they did with the
> disciplinaries.

(*Id.*).

As one might surmise from this statement, Council did not offer testimony and refused to sign the disciplinary forms. (Doc. 32-6 at 1 ("Inmate Council raised both hands when ask to raise one, refused to be sworn in. Was wanting to play after repeating 'I'm just wanting my toilet fixed' over and over, he was dismissed from his hearing.")).   Despite this, the hearing officer found Council not guilty of the unauthorized participation in social

10

networking charge. (Doc. 32-4 at 2).  However, the hearing officer found Council guilty of

the remaining three charges. (Doc. 32-3 at 2; doc. 32-5 at 2; doc. 32-6 at 2).

Council attended a reclassification hearing in December 2023, which his operative

complaint described in the following way:

> Plaintiff Council had a reclassification 'hearing,' an informal
> conversation with no witnesses or evidence, in early December
> 2023 based on the alleged October 15 assault. The day before
> the hearing, the officer who served Plaintiff Council the
> hearing notice told him that he knew Plaintiff Council didn't
> assault Sgt. Parker, and during the hearing, the classification
> supervisor said the same thing and explained that he was just
> doing his job. The classification supervisor recommend[ed]
> that Plaintiff Council's custody status be changed to "close
> custody."

(Doc. 67 at 11).[10]

On November 10, 2023, Council filed the instant lawsuit, and then on November

13, 2023, he amended his complaint.  In addition, he filed motions for a temporary

restraining order and for a preliminary injunction. (Doc. 3).  The Court denied Council's

motion for a temporary restraining order the same day (doc. 8); however, the Court

scheduled an evidentiary hearing for November 30, 2023 on Council's motion for a

preliminary injunction.  Thereafter, the Court allowed supplementary briefing, which, after

granting a requested extension, was submitted on December 14, 2023 by Council (doc. 51)

and January 4, 2024 by the Defendants (doc. 61).  Council filed a second amended

complaint, which is the operative complaint, on January 10, 2024. (Doc. 67).

---

[10] This particular allegation was first presented in Council's third declaration, rather than in the initial
complaints or at the November 30, 2023 evidentiary hearing.

In his supplementary briefing, Council makes a new allegation that several officers warned him to be careful what he eats because Pelzer "may seek" to poison him after making comments about Council filing the present action. (Doc. 51 at 24; doc. 51-3 at 15). Council says that this conversation took place on or around the week of November 13, 2023, but does not identify the officers who spoke with him.  He added this same allegation to his second amended complaint. (Doc. 67 at 37).

## IV.  DISCUSSION

As discussed above, Council seeks preliminary injunctive relief based on his First Amendment retaliation and Eighth Amendment failure to protect claims alleged in Counts One and Two, respectively.  Council argues that he is in immediate danger "in the form of continued subjection to unconstitutional solitary confinement and an ongoing risk of assault and murder." (Doc. 51 at 4).  Specifically, Council alleges that "he remains under substantial threat of being assaulted or murdered by Limestone correctional officers or at their behest." (*Id.* at 40).  As such, he seeks preliminary injunctive relief in the form of removal from restrictive housing and transfer to another ADOC correctional facility.

Council is entitled to a preliminary injunction if he demonstrates: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to it outweighs the harm the injunction would cause the other litigant; and (4) that the injunction would not be adverse to the public interest. *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022).  Where, as here, "the [State] is the party opposing the preliminary injunction, its interest and harm

merge with the public interest," and thus the third and fourth elements are the same. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

A preliminary injunction is "'not to be granted unless the movant clearly established the ''burden of persuasion''' for each prong of the analysis." *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (citation omitted).  Council, as the movant, must satisfy his burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  As it specifically relates to the irreparable injury prong, Council must show "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing various cases).  Moreover, the showing of irreparable injury "must be 'neither remote nor speculative, but actual and imminent.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989).  And such a showing "is an indispensable prerequisite to a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000).  Accordingly, the Court's analysis begins—and ends—with the irreparable injury prong.

Council has put forth insufficient evidence, at this stage, to demonstrate that he is likely to suffer in irreparable injury in the absence of a preliminary injunction.  The injuries which Council alleges will befall him in the absence of such injunctive relief are either speculative, remote, or unsubstantiated in the present record.

A.      **Irreparable Injury in Connection with Restrictive Housing**

The Court will first address Council's argument that his continued confinement in restrictive housing will result in irreparable injury.  Council's arguments on this issue are two-fold: (1) placement in restrictive housing is a "wrongful loss of liberty" (doc. 51 at 40–41); and (2) Council's placement in restrictive housing result in an irreparable injury in the form of chilling his First Amendment activity (*id.*).

Though Council's supplementary brief does not discuss this assertion to any extent, both in his operative complaint and during the November 30, 2023 evidentiary hearing, Council presented argument that his post-traumatic stress disorder ("PTSD") was exacerbated by restrictive housing to an extent which is violative of the Eighth Amendment to the United States Constitution. (Doc. 67 at 39–40).  It does not appear to the Court that Council has put forth any specific evidence, aside from his personal statements and sworn testimony, regarding his PTSD diagnosis or how he is medically affected by restrictive housing.  As a result, the Court is unable to fully examine this argument in the context of Council's pending motion for a preliminary injunction except to the extent that the Court notes a diagnosis of PTSD is not dispositive in the determination as to whether restrictive housing is violative of the Eighth Amendment. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1190 n.11, 1245–47 (M.D. Ala. 2017) (declining to "decide whether [restrictive housing] poses an unacceptably high risk of harm to all mentally ill prisoners as a general matter," but finding "that it is categorically inappropriate to place prisoners with serious mental illness in [restrictive housing] absent extenuating circumstances," while noting that

"diagnoses, like anxiety and PTSD, may reflect a serious mental illness depending on the degree and duration of the impairment.").[11]

Council's remaining arguments neglect to address his particular circumstances—namely that Council is an inmate serving a life sentence for capital murder. This fact distinguishes Council from the cases cited in his briefs on this subject. For instance, Council cites to *United States v. Washington*, a case from the Third Circuit in which a defendant successfully sought a writ of mandamus to prevent a district court from resentencing him following the district court's order vacating the defendant's original sentence. 549 F.3d 905, 905 (3rd Cir. 2008). In the Third Circuit's analysis, the court stated: "The error in this case, namely vacating a sentence absent authority to do so, will cause irreparable injury because it would result in Washington being subjected to a new sentencing hearing, and potentially more time in prison, after his term of incarceration has been served." *Id.* at 917. Here, Council is not being subjected to additional time as his sentence is life in prison. Moreover, loss of liberty is an inherent part of prison, especially when someone, like Council, is designated to a high security setting due to his conviction for murder and repeated violation of prison rules.

That said, inmates have constitutional protections, including that of the First Amendment. However, prison officials are afforded latitude in performing their duties, which includes limiting inmate privileges and rights—specifically, "[t]his means that an

---

[11] The Court here, and elsewhere in the opinion, cites to non-binding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's 'status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  Indeed, Council may be hampered from conducting First Amendment activity in the manner which he wishes from the confines of restrictive housing, but his presence there serves a legitimate penological objective of deterring inmate misconduct.  Namely, Council admitted during a hearing on his motion for preliminary injunction that he violated ADOC's rules regarding inmates' obligation to follow an order issued by an ADOC officer—this admission specifically relates to the third charge (failure to obey a direct order) stemming from the October 15, 2023 incident.  The following exchange took place between Mr. Elkins, counsel for the Defendants, and Council during the latter's testimony in the November 30, 2023 evidentiary hearing:

> Q. You mentioned that the officer [] came to your cell and ordered you to put your hands behind your back, right?
> A. He ordered me to turn around.
> Q. Okay. Did you turn around?
> A. No, sir.
> Q. Aren't you aware that you have to follow ADOC orders when they issue an order?
> A. Excuse me?
> Q. Are you aware that when an ADOC officer issues an order, that you're supposed to follow it?
> A. I followed the order of the last office who told me to turn around and I lost my eye and had my head busted in three places.
> Q. But, Mr. Council, I understand that and I, you know, feel for you. But do you understand when an ADOC officer orders you to do something, that you're supposed to do it?

16

A. The last time I did that I lost an eye and I had my head busted in three places.
Q. I can understand you might have justifications. That's not what I'm asking. Do you understand –
A. It's not – I understand what you're saying.
Q. Okay. Did you obey the order that he issued?
A. No, sir.

(Doc. 50 at 205–06).[12]

Due to this admission, even if Council demonstrated impermissible intent on the part of ADOC officials or their employees to initially seek charges against Council in connection with the TikTok video, this would be insufficient to show Council's discipline as being an unlawful chilling of his First Amendment activities. *See O'Bryant v. Finch*, 637 F.3d 1207, 1220 (11th Cir. 2011) ("Any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary charges and sanctions) is severed since the harm is not in reaction to any protected activity, but directly due to an improper activity.").

In sum, Council's status as an inmate, especially as one that was found guilty of an infraction which he concedes he committed, gives officials at Limestone, and ADOC generally, the ability to subject Council to appropriate punishment without regard to whether Council's First Amendment activities are hindered.  To find otherwise would undermine ADOC's ability to effectively carry out its duties and run counter to precedent and statutory law.

---

[12] The references by Council to injuries he sustained to his eye and head are from the December 2021 incident at Donaldson.

**B.**     **Irreparable Injury in Connection with Risk of Assault or Murder**

It bears repeating that for Council to succeed on this prong, Council must demonstrate that he is *likely* to face irreparable injury in the form of assault or murder in the absence of injunctive relief. *See Winter*, 555 U.S. at 22.  Further, this showing "must be 'neither remote nor speculative, but actual and imminent.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285.  Thus, despite the fact that Council may subjectively believe himself to be in grave danger, the objective evidence in the present record simply does not meet the demanding standard for preliminary injunctive relief.

### 1.     *Pelzer's Alleged Threatening Statement in June 2023*

To begin, it seems appropriate for the Court to examine one of the quotes presented in bold on the front of Council's complaint: "'Even if y'all killed him [Robert Earl Council] I'll make sure nothing happens to y'all.' – Lt. Jeremy Pelzer speaking to the Crips gang members at Limestone prison in June 2023." (Doc. 67 at 1).  It is an alarming quote, but the story of Pelzer's alleged statement remains incomplete.

Council testified at the hearing that "[t]here were several young inmates that were on the yard that were talking to Lieutenant Pelzer. They were inquiring from Lieutenant Pelzer about trying to get one of their friends out of lockup." (Doc. 50 at 68).  Though he did not know everyone in this group, Council knew inmates who went by the names Little C and Dew Drop and "a couple of other real young guys out of Montgomery." (*Id.* at 69).  Council described the alleged incident in the following way:

> And approximately June 16th, 17th, whichever day was
> Father's Day, there was a group of guys who were on the yard.

18

And these guys had approached Lieutenant Pelzer, and they were requesting that one of their friends be let out of segregation. Had been in segregation for a number of years. And Lieutenant Pelzer referred back to these -- this group of young guys that, Robert Earl is the reason that Lewis can't get out of lockup, but if something happened to him, y'all do something to him or even kill him, I'll make sure that don't nobody get in trouble for it.

These -- the group of guys came back to me and informed me that I needed to be alert and aware because he had made a proposition to them to do me bodily harm to get me out of population. And just be the fact that they didn't do it didn't mean that the next group of people wouldn't do it.

(*Id.* at 30–31).

Obviously, "Little C" and "Dew Drop" are not these individual's "government names" and Council's attorneys represented at the hearing that Council would work to obtain their legal names along with statements from them. (*See id.* at 212–13). Based on the record, it appears they were unable to do so.

The story relayed by Council is facially alarming but suffers from several infirmities. One of which is clear—no one with personal knowledge of this alleged incident came forward to verify the circumstances and details of this episode. All Council can say, at this point, is that unnamed individuals approached him about a *potential* threat to his safety. This evidence is insufficient to demonstrate that Council is likely to face irreparable injury as the result of assault or murder by inmates at the behest of Pelzer. Moreover, the passage of eight months since such statements and the lack of reported incidents in connection with the alleged statement further reduce the likelihood of irreparable injury absent injunctive relief.

### 2.    *Statements from Other Individuals in the Supplemental Briefing*

Statements put forth in Council's supplementary briefing, similarly, do not satisfy the irreparable injury prong.  Council argues that these statements demonstrate that Pelzer evaded accountability for assaulting an inmate, deprived another of basic necessities after supporting this lawsuit, and protected gang members at Limestone after they stabbed a fellow inmate. (Doc. 51 at 41–42).  But even assuming these characterizations of the evidence are true, it does not show that Pelzer is likely to carry out such an action against Council.  Further, Council's argument that Pelzer "has manufactured anger against Plaintiff Council by publicly blaming Plaintiff Council for a prison-wide deprivation of commissary, planting the seeds for vengeful violence,"[13] (*id.* at 41), is similarly speculative.

Additionally, Council makes a new assertion that several officers warned him to be careful what he eats because Pelzer "may seek" to poison him after making comments about Council filing the present action. (Doc. 51 at 24; doc. 51-3 at 15).  Council says that this conversation took place on or around the week of November 13, 2023, but does not identify the officers.  Taking these statements at face value, they appear to be speculative rather than offering specific knowledge.  And at this juncture, the Court does not know if: (1) the statements were serious; (2) the officers were joking; or (3) the statements were something else entirely.  Notably, this incident was not mentioned at any point during the November 30, 2023 evidentiary hearing.

---

[13] The Court assumes, arguendo, this fact is true.

20

To bolster these arguments, Council provides citations to cases which are not analogous to the present case. (*See* doc. 51 at 42–43).  Namely, these cited cases involve inmates who either engaged in self-harm in the past or were previously attacked in the facility from which they seek a transfer—neither of which are applicable to Council. *See Melendez v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 1124753 (11th Cir. Apr. 15, 2022); *Hoskins v. Dilday*, 2017 WL 951410 (S.D. Ill. Mar. 10, 2017).  Here, while Council was attacked in 2021 at Donaldson, the record does not indicate that he has faced similar attacks or incidents at Limestone.

Of course, one could say that the purpose of injunctive relief is ultimately to prevent such violence prior to its occurrence.  Indeed, Council makes such an argument in his supplementary brief. (*Id.* at 41).  And the Eleventh Circuit has held this to be true. *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) ("… it is also well-established that injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm …'").  But the recognition of this basic principle does not swallow the requirement that Council must demonstrate that he is *likely* to face an *actual* and *imminent* irreparable injury in the form of assault or murder in the absence of injunctive relief. *See Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994).  The record as it currently appears to the Court does not make this demanding showing, and consequently, Council's motion for preliminary injunctive relief (doc. 3) is due to be denied on that basis.

**C.     Defendants' Motion to Exclude**

The Defendants filed a motion to exclude certain evidence on December 19, 2023. (Doc. 57).   The basis of this motion is largely that the Defendants did not see certain exhibits until Council's supplementary briefing on December 14, 2023.   In addition, the Defendants object to Council's third declaration (doc. 51-3) wherein Council adds additional allegations regarding remarks by classification specialists at the December 2023 reclassification hearing and an alleged threat by Officer Charley. (Doc. 57 at 3–4).

The motion (doc. 57) is due to be denied for two principal reasons: (1) the Court specifically allowed supplementary evidence which was not presented at the November 30, 2023 evidentiary hearing; and (2) the Court afforded appropriate weight to the evidence at issue in consideration of Council's motion for a preliminary injunction. *See Levi Strauss & Co. v. Sunrise Intern. Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'").

### V.  CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED that Council's motion for preliminary injunctive relief (doc. 3) is DENIED.  It is further

ORDERED that the Defendant's motion to exclude (doc. 57) is DENIED.

Done this 16th day of February, 2024.

                    /s/ Emily C. Marks
                  EMILY C. MARKS
                  CHIEF UNITED STATES DISTRICT JUDGE